## VOLUME 136

### CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA

AT TERM BEGINNING FIRST MONDAY OF OCTOBER, 1914

(66 South. 377)

No. 20705.

STATE ex rel. LANNG v. LONG, Criminal Sheriff.

In re LANNG.

(Nov. 4, 1914.)

*(Syllabus by the Court.)*

1. CONSTITUTIONAL LAW &=56 — COURTS-MARTIAL — LEGISLATIVE POWER — DELEGATION.

The provisions of the state Constitution, establishing the judiciary department of the state government and vesting the judicial power of the state in certain named and designated courts, do not preclude the exercise, by the General Assembly, of the power, granted by other provisions of the Constitution, to establish, as an instrumentality of the executive department, a "well-regulated militia," declared by the Constitution to be necessary "to the security of a free state," to provide by law how such militia shall be organized and trained, and incidentally, to authorize the creation of courts-martial, as one of the ancient and recognized methods by which such instrumentality may be regulated and disciplined.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 62–65; Dec. Dig. &=56.]

2. MILITIA &=8 — INCREASE OF CONTRACT OBLIGATIONS—LEGISLATIVE POWER—"CONTRACT."

Enlistment in the active militia of the state, save in times of war or public danger or disturbance, is voluntary, and is a "contract," and the state has no power, by the repeal of the law under which it was entered into (and which is the measure of the rights and obligations of the parties thereto) and the substitution of another law in its stead, to impose upon the other contracting party more onerous conditions and obligations to which he has not given his assent.

[Ed. Note.—For other cases, see Militia, Cent. Dig. §§ 14–18, 21; Dec. Dig. &=8.

For other definitions, see Words and Phrases, First and Second Series, Contract.]

3. HABEAS CORPUS &=85 — PROCEEDINGS — SUFFICIENCY OF EVIDENCE—ENLISTMENT—COURTS-MARTIAL.

Considering, together the several provisions of Act 191 of 1912, upon the subject of enlistment, the conclusion is well-nigh irresistible that, in the contemplation of that statute, the taking of the prescribed oath is the determinative act. But, without saying that no one can be held to have enlisted without having taken such oath, the court finds that the evidence here adduced, of acts and omissions by relator, is insufficient to establish such intention or consent on his part.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 77, 78; Dec. Dig. &=85.]

4. HABEAS CORPUS ☞94, 113 — PROCEED-INGS — JURISDICTION — SUPREME COURT — COURTS-MARTIAL—REVIEW.

The question of the jurisdiction of a court-martial is open to inquiry on habeas corpus is-sued from a court having authority to issue that writ; and the action of such court in the prem-ises may be reviewed by this court in the ex-ercise of the jurisdiction conferred by article 94 of the Constitution.

[Ed. Note:—For other cases, see Habeas Cor-pus, Cent. Dig. §§ 82, 92, 102–115; Dec. Dig. ☞94, 113.]

*(Additional Syllabus by Editorial Staff.)*

5. MILITIA ☞21—"COURTS-MARTIAL."

While "courts-martial" discharge judicial functions, and are in a sense courts, they are not within the meaning of article 84 of the Con-stitution, declaring that the judicial power of the state shall be vested in certain named courts.

[Ed. Note.—For other cases, see Militia, Cent. Dig. §§ 61–65; Dec. Dig. ☞21.

For other definitions, see Words and Phrases, First and Second Series, Courts-Martial.]

Habeas corpus by the State, on relation of Francis O. Lanng, against M. J. Long, Crim-inal Sheriff. Judgment for defendant, and relator applies for writs of certiorari and pro-hibition. Judgment of district court set aside, writ of habeas corpus reinstated and sustain-ed, and relator discharged.

A. Miles Coe and H. M. Wilkinson, both of New Orleans, for applicant. R. G. Pleasant, Atty. Gen., and Jos. E. Generelly, of New Orleans, for respondent. Frank D. Chretien, of New Orleans, in pro. per.

MONROE, C. J. Relator was prosecuted before a court-martial of the First Separate Troop of Cavalry, Louisiana National Guard, upon a charge of being absent from ordered drill, inspection, and instruction, in viola-tion of article 15, § 98, of Act 191 of 1912, was convicted, and sentenced to pay a fine of $10, or suffer imprisonment for ten days, and was imprisoned in conformity to the sentence, whereupon he obtained from the judge of division "B" of the criminal district court, a writ of habeas corpus, directing the sheriff, to whose custody he had been committed, to produce him, and to show cause, etc.; but, after hearing, the writ was discharged. Re-lator then applied to this court for writs of certiorari and prohibition, upon which ap-plication an order nisi was issued, the effect of which has been to bring the ruling so made by the judge a quo before us for re-view. The points mainly relied on are: (1) That there exists no authority, under the Constitution of this state, for the creation of courts-martial; (2) that even though such court were authorized, relator would not have been subject to its jurisdiction, for the reason that he had ceased to be a member of the state militia.

[1] 1. The distinction between courts-martial and the courts which pertain to the judicial branches of the state and the federal governments has long been recognized. In Dynes v. Hoover, 20 How. 65, 15 L. Ed. 838, plaintiff, having been convicted by a naval court-martial of attempting to desert from the navy, and sentenced to imprisonment, and the Secretary of the Navy having approved the sentence, the President issued an order to the marshal to receive the convict and com-mit him to the penitentiary, whereupon the convict brought an action of trespass and false imprisonment against the marshal in the Circuit Court of the United States for the District of Columbia, and by way of demurrer set up want of jurisdiction in the court-martial and in the President. Considering the question so presented, the Supreme Court said:

"Among the powers conferred upon Congress by the eighth section of the first article of the Constitution, are the following: 'To provide and maintain a navy;' 'to make rules for the government of the land and naval forces.'. And the eighth amendment, which requires a pre-sentment of a grand jury in cases of capital or otherwise infamous crime, expressly excepts from its operation 'cases arising in the land or naval forces.' And by the second section of the second article of the Constitution it is declared that, 'The President shall be commander in chief of the Army and Navy of the United States, and of the militia of the several states when called into the actual service of the United

States.' These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized nations, and that the power so to do is given without any connection between it and the third article of the Constitution, defining the judicial power of the United States; indeed, that the two powers are entirely independent of each other."

What has thus been said of the power of Congress to make rules for the government of the land and naval forces of the United States may also be said of the power of the General Assembly of Louisiana to make rules for the government of the land and naval forces of the state. Article 8 of the state Constitution declares that a "well-regulated militia" is "necessary to the security of a free state." Article 298 declares that:

"The General Assembly shall have authority to provide by law how the militia * * * shall be organized, officered, trained, armed and equipped, and of whom it shall consist."

And article 9 declares that:

"Prosecutions shall be by indictment or information; but the Legislature may provide for the prosecution of misdemeanors on affidavits; provided, that no person shall be held to answer for a capital crime unless on a presentment or indictment by a grand jury, except in cases arising in the militia when in actual service in time of war or public danger."

[5] The recognition of the necessity for a "well-regulated militia," the grant of authority to provide by law how the militia shall be organized, trained, etc., and the exception with respect to capital cases arising in the militia when in actual service in time of war or public danger, concern the militia as an instrumentality of the executive department of the government, and concern the methods, other than through appeals to the judiciary, by which that instrumentality may be made effective. And, though courts-martial, created or authorized in the exercise of the power thus impliedly, if not expressly granted, may and do discharge judicial functions, and are therefore in some sense courts, they are not the courts to which article 84 of the Constitution refers, in declaring that the judicial power of the state shall be vested in certain named courts and in others thereafter provided in the Constitution, and which are instrumentalities of the judiciary department. And, to that effect is the jurisprudence of the Supreme Court of the United States, and of perhaps the greater number of the courts of last resort of the states. 27 Cyc. 496, 497, note.

There is some contrariety of opinion among the state courts as to the manner and extent in, and to, which the rulings of courts-martial, in matters affecting the militia of the different states, may be reviewed and controlled. State ex rel. Poole v. Nuchols, 18 N. D. 233, 119 N. W. 632, 20 L. R. A. (N. S.) 413, "case note." But, no one denies that the question of jurisdiction is always open to inquiry upon a writ of habeas corpus (Ex parte Carll, 106 U. S. 521, 1 Sup. Ct. 535, 27 L. Ed. 288, note); and, as no appeal lies in this case, there can be no question of the authority of this court to review, in the manner here proposed, the action of the district court, in discharging that writ. Const. art. 94; Garland's Code of Practice (Roehl), art. 855, p. 629, and authorities there cited.

[2-4] 2. Acts 181 of 1904 and 191 of 1912 alike divide the militia into "active and reserve" and confer upon the "Governor the power, under certain conditions, to order" that there be drafted, from the reserve into the active militia, as many persons, subject to militia duty, as may be needed. But those conditions did not arise, and that power was not exercised under the act of 1904, and have not arisen and has not been exercised under the act of 1912. Enlistment in the active militia was and is purely voluntary, therefore, under both statutes. The act of 1912 imposes many conditions and obligations that were not contained in the act of 1904, and is apparently intended to operate as a piece of legislation complete in itself

and covering the entire subject with which it deals. The title reads:

"An act to define and provide for the organizing and disciplining of the militia, to provide penalties for the violation of the same, to prescribe the duties of the Governor, the Adjutant General, and all officers and enlisted men thereof, to define military offenses, to provide penalties therefor and the method of enforcing the same, to provide for the pay, transportation and subsistence of the militia when called into actual service, and to repeal all laws in conflict therewith, especially act 181, approved July 6th, 1904."

The last section reads:

"That all laws and parts of laws in conflict with the provisions of this act, especially act No. 181 of the General Assembly of Louisiana, approved July 6th, 1904, and all acts amendatory thereof, be and the same are hereby repealed."

It is quite true that it contains also the sections 2 and 15 which the learned judge, made respondent, has quoted in his opinion, and which declare, in effect (section 2) that "the Active Militia" and the National Guard "of the state shall consist of the regularly enlisted, organized, and uniformed military forces, who have heretofore participated or shall hereafter participate in apportionment of the annual appropriation provided by section 1661 of the Revised Statutes of the United States, as amended" (U. S. Comp. St. 1913, § 3054), and (section 15) "shall consist of the necessary staff department, the commissioned officers heretofore or hereinafter retired, the organization forming the National Guard at this date, and such other * * * as * * * may be enlisted as (or) commissioned therein." But relator had become a member of the "regularly * * * enlisted * * * force" by virtue of his acceptance of an offer which, reduced to definite terms as Act No. 181 of 1904, the state had made, to grant him certain privileges, and, under certain conditions, to feed, clothe, pay and pension him, in consideration of his assuming certain specified obligations and consenting to subject himself, for a spec-

ified term, to certain rules and regulations. In other words, he was a member of the force, referred to in the act of 1912, by virtue of a contract, which, by the act of 1912, the state assumed to "repeal," and for which it assumed to substitute that act.

In United States v. Grimley, 137 U. S. 147, 11 Sup. Ct. 54, 34 L. Ed. 636, it appeared that the defendant (in error) was 40 years old at the time of his alleged enlistment, whereas the law required that recruits should be effective, able bodied men, between the ages of 16 and 35, and the question was, whether he could be punished, by court-martial, for desertion. The Supreme Court said:

"The government, as contracting party, offers contract and service. Grimley accepts such contract, declaring that he possesses all the qualifications prescribed in the government's offer. The contract is duly signed. Grimley has made an untrue statement in regard to his qualifications. The government makes no objection because of the untruth. The qualification is one for the benefit of the government, one of the contracting parties. Who can take advantage of Grimley's lack of qualification? Obviously only the party for whose benefit it was inserted. Such is the ordinary law of contracts."

The case of the relator now before us is quite different. He made no untrue statement, and is not now trying to gain advantage by reason of any wrong committed by him. The state has undertaken to repeal the law which contained the offer that he accepted, and which was the sole measure of his rights and obligations under the contract so made, and to substitute in its place another law, purporting to impose upon him conditions and obligations which differ from, and are harsher and more onerous, in material respects, than those to which he had agreed, and his answer to the attempt to enforce those conditions and obligations is "I have not consented to them," which we think is sufficient.

It is said that, after the passage of the act of 1912, relator attended some of the musters or drills of his company, and that, when he

failed so to do, he was prosecuted before courts-martial and fined, and that, on two occasions he paid the fines, from which, it is deduced that he accepted the new contract thus tendered, or sought to be imposed on, him, and became an enlisted man according to its terms. The evidence, however, fails to convince us that the acts attributed to him amounted to an enlistment; for at that time the act of 1912 had never been authoritatively interpreted or construed with the act of 1904, nor has it ever since then, been so interpreted or construed. The contention in this case has been that it operated, at once, upon all persons who were then members of the active militia, and, whether with or without their knowledge or consent, imposed its conditions and obligations upon them; and we assume that such was the view taken by the captain of relator's troop, by whom he is prosecuted, and that, taking that view, he felt it to be his duty to enforce the act to the extent of his ability. Relator and other members of the "troop" were therefore in the position of being required to comply with the provisions of the new law or else to submit to the consequences; and it is not surprising that, for a time at least, they should have chosen the alternative first mentioned. But the new law did not have the effect thus attributed to it, and acts that may have been performed by relator, as an enlisted man, under what he erroneously believed to be the compulsion of a highly penal statute, as construed and administered by his superior officers, contained none of the elements of a voluntary enlistment and contract. The fact that, when apparently he began to realize the true situation that had been brought about, he refused to be bound by the act of 1912, because he was unwilling to accept it as his contract of employment, and that he was court-martialed on account of such refusal, and on two occasions paid the fines imposed on him as the alternative

of imprisonment, can hardly be regarded as evidence of a voluntary re-enlistment, the more especially when we consider that the act of 1912 contains the following provisions and requirements upon the subject of enlistment, which were entirely ignored, to wit:

"Sec. 40. * * * That every person who enlists or re-enlists in the active militia of this state shall sign and make oath to an enlistment paper, which shall be filed in the office of the Adjutant General. * * * A person making a false oath to any statement contained in such enlistment paper shall, upon conviction, be deemed guilty of false swearing and punished accordingly. * * *

"Section 98. * * * That the military forces of this state shall be governed by the following rules and articles. * * *

"Art. 1. Enlistment in the active militia of this state shall be voluntary, and every person who enlists therein shall take and subscribe an oath (or affirmation) in the following words:

"I, * * * do solemnly swear (or affirm) that I will support the Constitution and laws of the United States and the Constitution and laws of the state of Louisiana; that I will obey the orders of the Governor, as commander in chief of the military forces of the state, and of all other officers appointed over me, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as a citizen soldier in the service of the state of Louisiana, according to the best of my ability and understanding. So help me God. * * *

"Art. 2. No enlisted man, *duly sworn*, shall be discharged * * * without a discharge in writing, approved by his commanding officer. * * *"

The oath referred to in section 40 evidently relates to the qualifications required of persons who enter the service by means of enlistment papers, as contradistinguished from those who receive commissions, whilst that prescribed by section 98, being an oath of allegiance, obedience, etc., is required, as we imagine, of *all* persons who enter the service, though the language of the statute is, "every person who *enlists*." However that may be, it is certainly required, as is the oath referred to in section 40, of the man who *enlists*. Whether the two oaths are, as a matter of custom combined into one or taken separately does not appear, and is a matter of no present concern. What does

concern this case, however, is that, taking the several provisions that have been quoted together, the conclusion is well-nigh irresistible that, in the contemplation of the law, the taking of the oath is determinative of the enlistment; and, though we will not say that no man can be held to have enlisted without having taken the oath, we are of opinion that, to so hold, the evidence of the intention to enlist should be very much stronger than that which has been here presented.

In the case of United States v. Grimley, supra, the question was presented whether the defendant (in error) had in fact enlisted, and the court quoted the oath which he had taken, and which read, in part, as follows:

"I, John Grimley, born in Armagh, in the state of Ireland, aged twenty eight years and —— months, and by occupation a groom, do hereby acknowledge to have voluntarily enlisted, this eighteenth day of February, 1888, as a soldier in the army of the United States of America. * * * "

After which the opinion proceeds:

"The question presented is whether the petitioner had in fact enlisted and become a soldier. It will be noticed that, in this oath of allegiance is an acknowledgment that he had enlisted, and that it was not an agreement to enlist. * * * Section 1342 of the Revised Statutes provides that the army of the United States shall be governed by certain rules and articles thereafter stated. Article 2 provides:

" 'These rules and articles shall be read to every enlisted man, at the time of, or within six days after, his enlistment, and he shall thereupon take an oath or affirmation.' * * * Obviously the oath is the final act in the matter of enlistment. * * * We conclude * * * that the taking of the oath of allegiance is the pivotal fact which changes the status from that of civilian to that of soldier."

It is true that the court also recognizes that the receipt of pay may operate as, or be, the equivalent of, an enlistment; but it does not appear that any oath whatever was taken by the relator now before the court, or that he received any pay, and the evidence fails, in our opinion, to show any en-listment or intention to enlist, as resulting from any other acts or omissions on his part, after the passage of the act of 1912. He is not insisting upon the maintenance of his contract as represented by the act of 1904, but is merely resisting the attempt to force upon him, as a contract of enlistment, the act of 1912, and in so doing we are of opinion that he is sustained by the facts and the law.

It is therefore ordered that the judgment of the district court, here made the subject of review, be set aside, that the writ of habeas corpus, issued by that court at the instance of relator, be now reinstated and sustained, and that relator be discharged.