# CALDWELL v. PARKER, SHERIFF OF CALHOUN COUNTY, ALABAMA.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ALABAMA.

No. 636. Argued March 4, 5, 1920.—Decided April 19, 1920.

The jurisdiction to try and punish for the crime of murder, committed by a person in the federal military service upon a civilian while the nation is at war, but in a place within the jurisdiction of a State where hostilities are not present and where martial law has not been proclaimed, is not vested exclusively in a military court-martial by the Articles of War of 1916; and conviction and sentence of a soldier, in such circumstances, in the state court, are not void. So *held*, where no demand for the culprit had been made upon the State by the military authorities. P. 385.

Affirmed.

THE case is stated in the opinion.

*Mr. Henry E. Davis* and *Mr. Charles D. Kline,* with whom *Mr. James A. Cobb* was on the brief, for appellant:

Comparing former Article 58, Rev. Stats., § 1342, with present Article 92, it is first particularly to be noted that, whereas the former used the expression that the offenses therein mentioned "shall be punishable" (of which language as used in the Enrolment Act of March 3, 1863, this court in *Coleman* v. *Tennessee,* 97 U. S. 509, remarked: "It simply declares that the offences shall be 'punishable,' not that they shall be punished by the military courts; and this is merely saying that they may be thus punished") the present Article 92 distinctly provides that "any *person* subject to military law who commits" either crime in the Article mentioned, of which murder is one, "*shall suffer* death or imprisonment for life, *as a court-martial may direct.*" The difference in language between the two sections, old and new, cannot be regarded as accidental and must be regarded as industrious. As Congress is to be presumed to have had in mind the language of this court in the *Coleman Case,* this conclusion is inevitable. Congress, instead of providing that the offenses mentioned should be "punishable," intended that the offender should suffer the prescribed penalty, to be inflicted by the designated tribunal, namely, a court-martial.

By existing Article 74 it is required of the commanding officer, and of him only, upon application of the civil authorities, and upon such application only, to deliver to the latter, or to aid in apprehending or securing for the latter, for trial, a soldier accused of crime, except one who is at the time held by the military authorities as prescribed, and also, "*except in time of war;*" and the penalty incurrable by the commanding officer who upon such application refuses or wilfully neglects to do as required is

to be visited upon him only *in time of peace.* Again,
whereas present Article 92 provides that a soldier com-
mitting murder shall suffer the prescribed penalty by
sentence of a court-martial, it further provides that no
soldier accused of such offense shall be tried by that
tribunal if the offense be committed *"in time of peace."*
If, therefore, these Articles are so to be read as to give
effect to each and all of their provisions, they mean this:
that in time of peace a soldier charged with murder must
be tried by the civil authorities and cannot be tried by
the military, but that in time of war the military authority
over the soldier is primary, paramount and exclusive.

From another viewpoint this conclusion seems equally
unavoidable. The citizen—by which is meant *every* citi-
zen—is under obligation to national military service, and
the right of the nation to require such service is para-
mount; the army of which the citizen becomes a member
is a body of men whose business is war, and what is more,
the body which the nation has formed and is using as its
instrumentality to carry on war; and so impossible is it
to say that the services of *every* citizen capable of bearing
arms may not become indispensable for the defense of the
country, that it follows as a corollary that *every* citizen
must be kept in a situation and condition to render those
services at any and every moment of his time.

When, therefore, the citizen becomes a member of the
army in time of war, he is, for the time being and for the
purposes of the services due by and required of him, with-
drawn from civil life and transferred to a separate and
distinct realm, namely, the realm of military life. He
ceases for the time being to be of the civil citizenry and
becomes a member of the military citizenry, and is sub-
ject accordingly to the laws and regulations governing
the latter and not to those governing the former: all this,
of course, during a state of war. And if this be so, no
civil authority may for the time being lay hand upon him

because of any act for which, except for his temporary condition, he would have been amenable to the civil law and its authorities.

The language of this court in the *Coleman Case* respecting the exclusiveness, or the contrary, of the jurisdiction of the military tribunal under the section of the Enrollment Act under consideration is plainly *obiter dictum,* and should therefore not be, and is not, controlling.

The cases of *Ex parte Mason,* 105 U. S. 696; *Grafton* v. *United States,* 206 U. S. 333, and *Franklin* v. *United States,* 216 U. S. 559, arose in time of peace, and under the former, and not the present, Articles of War; and the language of the court in each of those cases is to be restricted in application accordingly. [Counsel also cited *Tennessee* v. *Hibdom,* 23 Fed. Rep. 795; *Ex parte King,* 246 Fed. Rep. 868; and *Kepner* v. *United States,* 195 U. S. 100, 128.]

In the judgment now under review it is recited that there is no averment in the petition that the military authorities at any time demanded the surrender of the petitioner. Of this it ought to suffice to say that the failure of those authorities to put their jurisdiction in play cannot be said to cancel or abrogate it.

Nor would the case be affected if the fact were that any one in military authority had delivered the petitioner to the civil authorities for trial: as respects this, it suffices to say that no one in military authority has any right so to do; that no one but the commanding officer is charged with the duty of delivering an accused soldier to the civil authorities, and that in time of war that obligation is not even on him.

*Mr. J. Q. Smith,* Attorney General of the State of Alabama, and *Mr. Niel P. Sterne,* with whom *Mr. Benjamin Micou* was on the brief, for appellee.

*The Solicitor General* and *Mr. H. S. Ridgely,* by leave of court, filed a brief as *amici curiœ,* in behalf of the United States.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Pending the existence of a state of war with Germany the appellant, a soldier in the Army of the United States serving in a camp in Alabama, was tried and convicted for the murder of a civilian at a place within the jurisdiction of the State and not within the confines of any camp or place subject to the control of the civil or military authorities of the United States. The conviction was reviewed and affirmed by the Supreme Court of Alabama and was reëxamined and reaffirmed on rehearing.

The case is here to reverse the action of the court below in refusing on writ of habeas corpus a discharge which was prayed on the ground that, under the circumstances stated, the sentence was void because the state court had no jurisdiction whatever over the subject of the commission of the crime, since under the Constitution and laws of the United States that power was exclusively vested in a court-martial.

As there was no demand by the military authorities for the surrender of the accused, what would have been the effect of such a demand, if made, is not before us. The contention of a total absence of jurisdiction in the state court is supported in argument, not only by the appellant, but also by the United States in a brief which it has filed as *amicus curiœ.* These arguments, while differing in forms of expression, rest upon the broad assumption that Congress in reënacting the Articles of War in 1916, by an exercise of constitutional authority, vested in the military courts during a state of war exclusive jurisdiction to try and punish persons in the military service for offenses

committed by them which were violative of the law of the several States. In other words, the proposition is that under the Act of 1916, by mere operation of a declaration of war, the States were completely stripped of authority to try and punish for virtually all offenses against their laws committed by persons in the military service. As in both arguments differences between the provisions of the Act of 1916 and the previous Articles are relied upon to sustain the accomplishment of the result contended for, we must briefly consider the prior Articles before we come to test the correctness of the conclusion sought to be drawn from the Articles of 1916.

The first Articles of War were adopted in 1775. By them the generic power of courts-martial was established as follows:

"L. All crimes, not capital, and all disorders and neglects, which officers and soldiers may be guilty of, to the prejudice of good order and military discipline, though not mentioned in the articles of war, are to be taken cognizance of by general or regimental court-martial, according to the nature and degree of the offence, and be punished at their discretion."

It cannot be disputed that the effect of this grant was to confer upon courts-martial as to offenses inherently military an exclusive authority to try and punish. In so far, however, as acts which were criminal under the state law but which became subject to military authority because they could also appropriately be treated as prejudical to good order and military discipline, a concurrent power necessarily arose, although no provision was made in the Articles regulating its exercise. But this omission was provided for in Article 1 of § X of the revised Articles adopted in 1776, as follows:

"Whenever any officer or soldier shall be accused of a capital crime, or of having used violence, or committed any offence against the persons or property of the good people

of any of the United American States, such as is punishable by the known laws of the land, the commanding officer and officers of every regiment, troop, or party, to which the person or persons so accused shall belong, are hereby required, upon application duly made by or in behalf of the party or parties injured, to use his utmost endeavors to deliver over such accused person or persons to the civil magistrate; and likewise to be aiding and assisting to the officers of justice in apprehending and securing the person or persons so accused, in order to bring them to a trial. If any commanding officer or officers shall wilfully neglect or shall refuse, upon the application aforesaid, to deliver over such accused person or persons to the civil magistrates, or to be aiding and assisting to the officers of justice in apprehending such person or persons, the officer or officers so offending shall be cashiered."

In view of the terms of this Article and the fact that it was drawn from the British Articles, where the supremacy of the civil law had long prevailed, it results that its provisions gave the civil courts, if not a supremacy of jurisdiction, at least a primary power to proceed against military offenders violating the civil law, although the same acts were concurrently within the jurisdiction of the military courts because of their tendency to be prejudicial to good order and military discipline.

And in harmony with this view, the Articles in question were applied up to 1806, in which year they were reënacted without change as Articles 99 and 33 of that revision, and were in force in 1863, in the Enrollment Act of which year, it was provided (Act of March 3, 1863, c. 75, § 30, 12 Stat. 736):

"That in time of war, insurrection, or rebellion, murder, assault and battery with an intent to kill, manslaughter, mayhem, wounding by shooting or stabbing with an intent to commit murder, robbery, arson, burglary, rape, assault and battery with an intent to commit

rape, and larceny, shall be punishable by the sentence of a general court-martial or military commission, when committed by persons who are in the military service of the United States, and subject to the articles of war; and the punishments for such offences shall never be less than those inflicted by the laws of the state, territory, or district in which they may have been committed."

It is to be observed that by this section there was given to courts-martial, under the conditions mentioned, power to punish for capital crimes, from which their authority had been from 1775 expressly excluded; and power was also given to deal, under the conditions stated and in the manner specified, with other enumerated offenses over which they had not prior to the passage of the act had jurisdiction, presumably because such acts had not in practice been treated as within the grant of authority to deal with them as prejudicial to good order and military discipline.

In 1874, when the Articles of War were revised and reenacted (Rev. Stats., § 1342), the generic grant of power to punish acts prejudicial to good order and military discipline was reëxpressed in Article 62, substantially as it existed from 1775. The provisions of § 30 of the Act of 1863, *supra*, were in so many words made to constitute Article 58; and the duty put upon military officials, to surrender to state officers on demand persons in the military service charged with offenses against the State, was reënacted in Article 59, qualified, however, with the words, "except in time of war." Thus the Articles stood until they were reënacted in the Revision of 1916, as follows:

The general grant of authority as to acts prejudicial to good order and military discipline was reënacted in Article 96, substantially as it had obtained from the beginning. The capital offenses of murder and rape, as enumerated in § 30 of the Act of 1863, were placed in a distinct Article

and power was given to military courts to prosecute and punish them, as follows:

"Art. 92. Murder—Rape.—Any person subject to military law who commits murder or rape shall suffer death or imprisonment for life, as a court-martial may (be) direct; but no person shall be tried by court-martial for murder or rape committed within the geographical limits of the States of the Union and the District of Columbia in time of peace." (39 Stat. 664.)

The remaining offenses enumerated in the Act of 1863 were placed in a separate Article, as follows:

"Art. 93. Various Crimes.—Any person subject to military law who commits manslaughter, mayhem, arson, burglary, robbery, larceny, embezzlement, perjury, assault with intent to commit any felony, or assault with intent to do bodily harm, shall be punished as a court-martial may direct." (39 Stat. 664.)

And finally, the duty to respond to the demand of the state authorities for the surrender of military offenders against the state criminal laws was reënacted as it had prevailed from the beginning, subject however to express regulations to govern in case of conflict between state and federal authority, and again subject to the qualification, "except in time of war," as first expressed in the Revision of 1874, the Article being as follows:

"Art. 74. Delivery of Offenders to Civil Authorities.— When any person subject to military law, except one who is held by the military authorities to answer, or who is awaiting trial or result of trial, or who is undergoing sentence for a crime or offense punishable under these articles, is accused of a crime or offense committed within the geographical limits of the States of the Union and the District of Columbia, and punishable by the laws of the land, the commanding officer is required, except in time of war, upon application duly made, to use his utmost endeavor to deliver over such accused person to the civil

authorities, or to aid the officers of justice in apprehending or securing him, in order that he may be brought to trial. Any commanding officer who upon such application refuses or willfully neglects, except in time of war, to deliver over such accused person to the civil authorities or to aid the officers of justice in apprehending and securing him shall be dismissed from the service or suffer such other punishment as a court-martial may direct." (39 Stat. 662.)

Comprehensively considering these provisions, it is apparent that they contain no direct and clear expression of a purpose on the part of Congress, conceding for the sake of the argument that authority existed under the Constitution to do so, to bring about, as the mere result of a declaration of war, the complete destruction of state authority and the extraordinary extension of military power upon which the argument rests. This alone might be sufficient to dispose of the subject for, as said in *Coleman* v. *Tennessee*, 97 U. S. 509, 514, "With the known hostility of the American people to any interference by the military with the regular administration of justice in the civil courts, no such intention should be ascribed to Congress in the absence of clear and direct language to that effect." Certainly, it cannot be assumed that the mere existence of a state of war begot of necessity the military power asserted, since the Articles of War, originally adopted in 1775, were, as we have seen, in the very midst of the War for Independence, modified in 1776 to make certain the preservation of the civil power.

But the contention relied upon is directly based upon the words, "except in time of war," as qualifying the duty of the military officers to respond to the demand by state authority for the surrender of military offenders against the state criminal laws, imposed by Article 74, and the grant in Article 92, expressed in the form of a negative pregnant, of authority to courts-martial to try capital

crimes when committed by an officer or soldier within the geographical limits of the United States and the District of Columbia in time of war. Both these provisions took their origin in the Act of 1863 and were drawn from the terms of that act as reëxpressed in the Revision of 1874. By its very terms, however, the Act of 1863 was wholly foreign to the destruction of state and the enlargement of military power here relied upon. It is true, indeed, that by that act authority was for the first time given, as pointed out in the *Coleman Case*, 97 U. S. 509, 514, to courts-martial or military commissions to deal with capital and other serious crimes punishable under the state law. But the act did not purport to increase the general powers of courts-martial by defining new crimes, or by bringing enumerated offenses within the category of military crimes as defined from the beginning, as we have already pointed out, but, simply contemplated endowing the military authorities with power, not to supplant, but to enforce, the state law. As observed by Winthrop, in his work on Military Law, 2d ed., p. 1033, it was intended to provide, through the military authorities, means of enforcing and punishing crimes against the state law committed by persons in the military service where, as the result of the existence of martial law or of military operations, the courts of the State were not open and military power was therefore needed to enforce the state law. And it was doubtless this purpose indicated by the text, to which we have already called attention, which caused the court in the *Coleman Case* to say that that statute had no application to territory where "the civil courts were open and in the undisturbed exercise of their jurisdiction." (P. 515.)

As in 1866 it was settled in *Ex parte Milligan*, 4 Wall. 2, that a state of war, in the absence of some occasion for the declaration of martial law or conditions consequent on military operations, gave no power to the military authorities where the civil courts were open and capable of per-

forming their duties, to disregard their authority or frustrate the exercise by them of their normal and legitimate jurisdiction, it is indeed open to grave doubt whether it was the purpose of Congress, by the words "except in time of war," or the cognate words which were used with reference to the jurisdiction conferred in capital cases, to do more than to recognize the right of the military authorities, in time of war, within the areas affected by military operations or where martial law was controlling, or where civil authority was either totally suspended or obstructed, to deal with the crimes specified,—a doubt which if solved against the assumption of general military power, would demonstrate, not only the jurisdiction of the state courts in this case, but the entire absence of jurisdiction in the military tribunals. And this doubt becomes additionally serious when the Revision of 1874 is considered, since in that revision the Act of 1863 was in terms reënacted and the words "except in time of war," appearing for the first time in Article 59 of that revision, could have been alone intended to qualify the time of war with which the act dealt, that is, a condition resulting from a state of war which prevented or interfered with the discharge of their duties by the civil courts.

Into the investigation of the subject of whether it was intended by the provision "except in time of war," contained in the Articles of 1916, to do more than meet the conditions exacted by the actual exigencies of war like those contemplated by the Act of 1863, and which were within the purview of military authority, as pointed out in *Ex parte Milligan*, we do not feel called upon to enter. We say this because even though it be conceded that the purpose of Congress by the Article of 1916, departing from everything which had gone before, was to give to military courts, as the mere result of a state of war, the power to punish as military offenses the crimes specified when committed by those in the military service, such admission is

here negligible because, in that view, the regulations relied upon would do no more than extend the military authority, because of a state of war, to the punishment, as military crimes, of acts criminal under the state law, without the slightest indication of purpose to exclude the jurisdiction of state courts to deal with such acts as offenses against the state law.

And this conclusion harmonizes with the principles of interpretation applied to the Articles of War previous to 1916; *Drury* v. *Lewis*, 200 U. S. 1; *Grafton* v. *United States*, 206 U. S. 333; *Franklin* v. *United States,* 216 U. S. 559; 6 Ops. Atty. Gen. 413; and is, moreover, in accord with the decided cases which have considered the contention of exclusive power in the military courts as resulting from the Articles of 1916 which we have here considered. *People* v. *Denman*, 179 California, 497; *Funk* v. *State*, 208 S. W. Rep. 509; *United States* v. *Hirsch*, 254 Fed. Rep. 109.

It follows, therefore, that the contention as to the enlargement of military power, as the mere result of a state of war, and the consequent complete destruction of state authority, are without merit and that the court was right in so deciding and hence its judgment must be and it is

*Affirmed.*