Ex Parte McKittrick, Attorney General, for and in behalf of Thomas F. Donaldson, Sheriff of Dunklin County, Petitioner, v. Harold W. Brown, Adjutant General of the State of Missouri.—85 S. W. (2d) 385.

Court en Banc, July 10, 1935.

*Roy McKittrick*, Attorney General, and *Wm. O. Sawyers*, Assistant Attorney General, for petitioner.

*Carroll W. Berry* for respondent.

ELLISON, J.—The Attorney General brings *habeas corpus* in behalf of Thomas F. Donaldson, Sheriff of Dunklin County, Missouri, to obtain custody of one Ray Bixler from Harold W. Brown, Adjutant General of the State of Missouri. The sheriff has a warrant for the arrest of Bixler on a charge of second degree murder. The Adjutant General holds him as a prisoner awaiting trial before a court-martial for the same homicide. The ultimate question to be determined is whether the trial of the prisoner shall be in the State circuit court or in the military court.

The prisoner is a private in Company B, 140th Infantry, Missouri National Guard. Early in March, 1935, floodwaters from the St. Francois River inundated a large amount of land along the course thereof in Butler and Dunklin counties, and threatened the levee on the Missouri side of the river where it runs between Dunklin County, Missouri, and Clay and Greene counties, Arkansas. Because of these and resulting conditions, and pursuant to Section 13846, Revised Statutes 1929, the Governor of Missouri issued an executive order declaring a state of emergency to exist in Butler and Dunklin counties and further providing "the use of such military forces of the State as may be necessary for the preservation of life and property and the maintenance of law and order is hereby authorized."

In accordance with this executive order the Adjutant General mobilized a provisional battalion comprised of said Company B, and two other companies, and the same was assigned to duty in the distressed area. At a point near Cardwell in Dunklin County State Highway No. 25 crosses the St. Francois River on a bridge known as Hopkins bridge. To facilitate the movement of tools, implements and materials required in repairing and reenforcing the levee, and to relieve traffic congestion and prevent injury to workmen, travelers and others, the commanding officer of the battalion ordered guards posted along the bridge approach and flares and slow signs put out. Instructions to the guards, of whom private Bixler was one, were to flag all vehicles and request the drivers to slow down. If the flag signals were disregarded the guard was to halt them, and if this command was not obeyed he was to fire

one shot in the air, particularly for the purpose of apprising the next guard of the approach of such vehicle.

During the night of March 21, 1935, while it was dark and raining, an automobile in which one Miss Harriet Hasty was riding, drove along the highway. According to the statement of Bixler the driver of the automobile disregarded his order to stop, and he thereupon attempted to fire his rifle in the air. He was holding a lantern in his right hand and the gun in his left hand and just as he pulled the trigger the butt of the rifle slipped on his wet clothing and the weapon was discharged so that the bullet struck Miss Hasty, who died the next day. By order of his commanding officer Bixler was immediately placed under military arrest "pending the investigation of the accidental shooting" of Miss Hasty and has since been confined in the armory at Caruthersville, Missouri, under guard.

Two days later, on March 23, after investigation a formal charge was lodged against Bixler, the same being signed and verified by his commanding officer Capt. Jules V. Moore. The specifications therein are:

(1) that the accused violated the 92nd article of war, Section 1564, U. S. C. A., Title 10, page 315, in that he did "at the Hopkins bridge, on the St. Francois River, near Cardwell, Missouri, on or about March 21, 1935, with malice aforethought, willfully, deliberately, feloniously, unlawfully and with premeditation kill one, Harriet Hasty, a human being by shooting her with a caliber .30 U. S. A. Rifle;"

(2) that the accused violated the 93rd article of war, Section 1565, U. S. C. A., Title 10, page 317, in that he did "at Hopkins bridge, on the St. Francois River, near Cardwell, Missouri, on or about March 21, 1935, willfully, feloniously and unlawfully kill one, Harriet Hasty, a human being, by carelessly and negligently pointing a loaded rifle Cal. .30 at the deceased and handling same in such a careless and negligent manner that the same was discharged, striking, wounding and killing the said Harriet Hasty."

Company B was demobilized by order of the Governor on March 23. Thereafter, on March 25, Elbert L. Ford, prosecuting attorney of Dunklin County, pursuant to Section 3467, Revised Statutes 1929, filed an affidavit for a State warrant before J. M. Kimbrow, a justice of the peace of the county, charging private Bixler with second degree murder in shooting and killing Miss Hasty, and the justice issued a warrant directed to the sheriff for the arrest of the accused. The sheriff presented the warrant to the military authorities who held Bixler in custody, but they, at the direction of the respondent Adjutant General, refused to surrender him, and this *habeas corpus* proceeding follows as a result.

■ I. In his brief suggestions the Attorney General cites only Section 27, Article II, of the State Constitution, which provides "that the military shall always be in strict subordination to the civil power." But we shall refer to several other provisions of the Constitution though the Attorney General has raised no question on them, because this is a case of first impression in Missouri and these other sections, or ones substantially like them, have been cited in judicial discussions of the same question in other jurisdictions. We may do this because we have original jurisdiction of the cause, and a consideration of all the sections together seems necessary to a complete determination of the case presented. [State ex rel. State Building Commission v. Smith, 336 Mo. 810, 81 S. W. (2d) 613, 615; Ex parte Bass, 328 Mo. 195, 201, 40 S. W. (2d) 457 (4).] By Section 1, Article VI, the judicial power of the State is vested in its courts. Section 10, Article II, provides the courts shall be open to every person; Section 28, Article II, that the right of trial by jury, as heretofore enjoyed, shall remain inviolate; and Section 30 of Article II that no person shall be deprived of life, liberty or property without due process of law.

■ But Article XIII of the Constitution provides for the establishment of a State militia, making certain of the State's inhabitants liable to military duty therein. Section 2 of that article commands that "the General Assembly, in providing for the organization, equipment and discipline of the militia, shall conform, as nearly as practicable, to the regulations for the government of the armies of the United States." And Section 12, Article II, provides that "no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information, which shall be concurrent remedies, *but this shall not be construed to apply to cases arising* in the land or naval forces or *in the militia when in actual service in time of war or public danger.*" (Italics ours.) This section is modeled after the Fifth Amendment to the Constitution of the United States. The excepting clauses in the two, beginning with the word "cases" are identical, save in punctuation.

Furthermore, Section 6, Article V of the State Constitution enjoins upon the Governor the duty to take care that the laws are faithfully executed and makes him a conservator of the peace throughout the State; and Section 7 of Article V provides that he "shall be commander-in-chief of the militia of this State, except when they shall be called into the service of the United States, and may call out the same to execute the laws, suppress insurrection and repel invasion." A statute, Section 13846, Revised Statutes 1929, has been enacted following this last-mentioned section of the Constitution, and providing that "the Governor may call out the national guard or any part of the same to execute the laws, to suppress insurrection, repel invasions and suppress lawlessness."

By virtue of the provisions of Sections 6 and 7 of Article V of the Constitution, just referred to, and Section 13846 of our statutes enacted pursuant thereto, the power to decide whether a public exigency exists such as justifies the calling out of the militia is vested solely in the Governor. [40 C. J., sec. 70, p. 692; United States ex rel. McMaster v. Wolters, 268 Fed. 69, 71; United States ex rel. Seymour v. Fischer, 280 Fed. 208, 210; Franks v. Smith, 142 Ky. 232, 238, 134 S. W. 484, 487, L. R. A. 1915A, 1141, 1150, Ann. Cas. 1912D, 319, 321; Ex parte McDonald, 49 Mont. 454, 461, 143 Pac. 947, 949, L. R. A. 1915B, 988, 991, Ann. Cas. 1916A, 1166, 1168.] And while the executive order in the instant cause did not use the words "public danger" appearing in Section 12 of Article II of the Constitution, supra, yet it declared the existence of "a state of emergency" and by necessary implication found conditions required the use of some part of the military forces of the State to preserve life and property and to maintain law and order in Butler and Dunklin counties. This was equivalent to a declaration that a state of public danger existed in the two counties. We do not understand the words public danger to refer only to grave calamities threatening the government of the State or a subdivision thereof, but construe them as meaning danger to the public with which the civil authorities are, in the opinion of the Governor, unable to cope.

The Governor having so ordained, the provision of Section 27, Article II of the Constitution that the military shall always be in strict subordination to the civil power, must, itself, be subordinated to the specific exception in Section 12 of the same article making inapplicable to cases arising in the militia when in actual service in time of public danger the requirement that all persons shall be prosecuted criminally for felony or misdemeanor only by indictment or information. In other words we hold that Section 27, Article II of the Constitution, and the aforesaid sections thereof guaranteeing an accused the right of jury trial in the civil courts, interpose no constitutional obstacle to the enactment of State statutes authorizing the trial of persons in the military service for felony or misdemeanor by court-martial, in cases arising in the militia when in actual service in time of public danger—found and declared by the Governor —especially where such statutes conform to the regulations for the government of the armies of the United States. [5 C. J., sec. 139, p. 344, sec. 158, p. 350; 40 C. J., sec. 83, p. 698, sec. 94, p. 700; Johnson v. Sayre, 158 U. S. 109, 39 L. Ed. 914, 15 Sup. Ct. 773; State ex rel. Lanng v. Long, 136 La. 1, 6, 66 So. 377, L. R. A. 1915E, 235, 236, Ann. Cas. 1917B, 240, 241; State ex rel. Poole v. Peake, 22 N. D. 457, 135 N. W. 197, 40 L. R. A. (N. S.) 354, 356.]

In this State statutes have been enacted providing for courts-martial, Article 6, Chapter 116, Revised Statutes 1929, and while their jurisdiction ordinarily is limited to purely military offenses,

in certain circumstances they can try persons in the military service for felonies and misdemeanors. Section 13831, Revised Statutes 1929, is as follows:

"Whenever any portion of the national guard is called out, or shall be on duty under or pursuant to the authority of the Governor as provided in this chapter, the articles of war governing the army of the United States and the regulations prescribed for the army of the United States, so far as such regulations are consistent with this chapter and the regulations issued thereunder, shall be in force and regarded as a part of this chapter until said forces shall be relieved from such duty. As to offenses committed when such articles of war are so enforced, courts-martial shall possess, in addition to the jurisdiction and power of sentence and punishment herein vested in them, all additional jurisdiction and power of sentence and punishment exercisable by like courts under such articles of war, or the regulations or laws governing the United States army, or the customs and usages thereof, but no punishment under such rules and articles which shall extend to the taking of life shall in any case be inflicted except in time of actual war, invasion or insurrection, declared by proclamation of the Governor to exist, and then only after the approval by the Governor of the sentence inflicting such punishment. Imprisonment other than in the guardhouse shall be executed in jails or prisons designated by the Governor for the purpose."

The statute evidently contemplates that whenever any portion of the national guard is called out, or shall be on duty under and pursuant to the authority of the Governor as provided in the chapter, a state of public danger will exist within the meaning of Section 12, Article II of the Constitution, supra. The statute then goes on to provide in plain terms that in such circumstances the articles of war governing the army of the United States shall be enforced, and that, as to offenses committed during that time, courts-martial shall possess all the jurisdiction exercised by like courts under the articles of war. From this it follows that the articles of war governing the army of the United States automatically were in force so long as the battalion to which the prisoner here belonged, was on duty. The two articles of war, Article 92, Section 1564, U. S. C. A., Title 10, page 315, and Article 93, Section 1565, U. S. C. A., Title 10, page 317, upon which were based the charges lodged against the prisoner by the military authorities, are as follows:

Art. 92. "Any person subject to military law who commits murder or rape shall suffer death or imprisonment for life, as a court-martial may direct; but no person shall be tried by court-martial for murder or rape committed within the geographical limits of the States of the Union and the District of Columbia in time of peace."

Art. 93. "Any person subject to military law who commits manslaughter, mayhem, arson, burglary, housebreaking, robbery, larceny,

embezzlement, perjury, forgery, sodomy, assault with intent to commit any felony, assault with intent to do bodily harm with a dangerous weapon, instrument, or other thing, or assault with intent to do bodily harm, shall be punished as a court-martial may direct."

There is another general article, Article 96, Section 1568, U. S. C. A., Title 10, page 321, as follows:

"Though not mentioned in these articles, all disorders and neglects to the prejudice of good order and military discipline, all conduct of a nature to bring discredit upon the military service, and all crimes or offenses not capital, of which persons subject to military law may be guilty, shall be taken cognizance of by a general or special or summary court-martial, according to the nature and degree of the offense, and punished at the discretion of such court."

The specification in the first charge (under Art. 92) is that the prisoner "did . . . with malice aforethought, willfully, deliberately, feloniously, unlawfully, and with premeditation kill one, Harriet Hasty, a human being by shooting her with a Caliber .30 U. S. Army rifle." Along with the other elements the specification alleges the homicide was committed deliberately. This constitutes a charge of first degree murder, State v. Liolios, 285 Mo. 1, 20, 225 S. W. 941, 947, for which the punishment under our statute may be death. [Sec. 3984, R. S. 1929.] The court-martial clearly had no jurisdiction to try the prisoner under Article 92 because that article explicitly forbids the trial of persons by court-martial for murder or rape within the geographical limits of the several states of the Union and the District of Columbia in time of peace. And even if we may disregard (see Art. 37, Sec. 1508, U. S. C. A., Title 10, p. 289) the reference in the first charge to Article 92 and should treat the specification thereunder as making a charge of homicide under general Article 96 (Grafton v. United States, 206 U. S. 333, 348, 51 L. Ed. 1084, 1089, 27 Sup. Ct. 749, 752, 11 Ann. Cas. 640, 643) it would still be invalid because under our State law murder in the first degree is a capital crime, and offenses of that class are by the express terms of the article excepted from its application.

But the second charge and specification, under Article 93, is that the prisoner did "willfully, feloniously and unlawfully kill one Harriet Hasty, a human being, by carelessly and negligently pointing a loaded rifle Cal. .30, at the deceased and handling same in such a careless and negligent manner that the same was discharged, striking, wounding and killing the said Harriet Hasty." This sufficiently charges manslaughter—that is, a willful killing without deliberation and not with malice aforethought, State v. Curtis, 70 Mo. 594, 600, —which, under our law is a felony punishable by imprisonment in the penitentiary, jail, sentence or fine. [Secs. 4471, 3997, R. S. 1929; State v. Talken, 316 Mo. 596, 601, 292 S. W. 32, 34.]

The court-martial has, or will have, jurisdiction to try the prisoner on this charge of manslaughter. But this further question arises. Where the offense charged is one cognizable by the civil courts, the jurisdiction of the court-martial is not exclusive, but concurrent with that of the State courts. [Caldwell v. Parker, 252 U. S. 376, 40 Sup. Ct. 388, 64 L. Ed. 621.] And the first paragraph of Article 74 of the articles of war, Section 1546, U. S. C. A., Title 10, page 310, provides:

''When any person subject to military law, *except one who is held by the military authorities to answer, or who is awaiting trial or result of trial, or who is undergoing sentence for a crime or offense punishable under these articles,* is accused of a crime or offense committed within the geographical limits of the States of the Union and the District of Columbia, and punishable by the laws of the land, the commanding officer is required, *except in time of war,* upon application duly made, to use his utmost endeavor to deliver over such accused person to the civil authorities, or to aid the officers of justice in apprehending and securing him, in order that he may be brought to trial. Any commanding officer who upon such application refuses or willfully neglects, except in time of war, to deliver over such accused person to the civil authorities or to aid the officers of justice in apprehending and securing him shall be dismissed from the service or suffer such other punishment as a court-martial may direct.'' (Italics ours.)

It would seem that the instant case comes squarely within the first exception in the above article. The prisoner is a person subject to military law; he is held by the military authorities to answer for a crime punishable under the articles of war; he is awaiting trial. We cannot find that this particular part of the article has ever been judicially construed. But in Caldwell v. Parker, supra, the Supreme Court of the United States reviewed the history of the articles of war and declared the meaning and effect of the other exception ''except in time of war'' appearing in Article 74. The opinion (252 U. S., l. c. 387, 40 Sup. Ct. l. c. 391, 64 L. Ed. l. c. 625) expresses grave doubt ''whether it was the purpose of Congress, by the words 'except in time of war,' . . . to do more than to recognize the right of the military authorities, in time of war, within the areas affected by military operations or where martial law was controlling, or where civil authority was either totally suspended or obstructed, to deal with the crimes specified,—a doubt which if solved against the assumption of general military power, would demonstrate, not only the jurisdiction of the State courts (in the case under adjudication), but the entire absence of jurisdiction in the military tribunal.'' In other words the opinion indicates a view that the spirit and purpose of the articles of war was to confer upon the State courts a prior or paramount jurisdiction to try persons in the military service

for criminal offenses cognizable by them, except in areas affected by military operations, or where martial law had been declared, or where civil authority is totally suspended or obstructed. And if this be true in time of *war*, all the more should it be true where the only reason supporting the military authorities in retaining jurisdiction against the State courts is that they had first asserted it.

In the instant case the civil authority, so far as this record shows, was neither totally suspended nor obstructed in Dunklin County; nor was the circuit court of that county unable to function and dispense justice. And the Governor did not declare martial law, as he might have done under Section 13825, Revised Statutes 1929. But what was said in Caldwell v. Parker, was purely *arguendo*. In its concluding paragraphs the opinion declines to enter upon an investigation of whether Congress "intended by the provision 'except in time of war' . . . to do more than meet the conditions exacted by the actual exigencies of war." And the case was decided on the point that since both the State court and the court-martial had concurrent jurisdiction of the homicide there involved, and the State court had enforced its jurisdiction and rendered judgment, the United States Supreme Court would not interfere by *habeas corpus* to nullify that judgment on the ground contended for by the petitioner that jurisdiction was *exclusively* vested in a court-martial to try the petitioner in time of war.

The Caldwell-Parker case was written by Mr. Chief Justice WHITE. Later, in Kahn v. Anderson, 255 U. S. 1, 9, 41 Sup. Ct. 224, 65 L. Ed. 469, he said, speaking of that case, that the sole question involved in it was "whether the jurisdiction which it was conceded such a court (court-martial) possessed was intended to be exclusive of a concurrent power in the State court to punish the same act, as the mere result of a declaration of war and without reference to any interruption, by a condition of war, of the power of the civil courts to perform their duty."

And in Grafton v. United States, 206 U. S. 1. c. 348, 51 L. Ed. 1. c. 1089, 27 Sup. Ct. 1. c. 752, 11 Ann. Cas., 1. c. 643, it was held: "That the civil tribunals cannot disregard the judgments of a general court-martial against an accused officer or soldier, if such court had jurisdiction to try the offense set forth in the charge and specifications; this, notwithstanding the civil court, if it had first taken hold of the case, might have tried the accused for the same offense or even one of higher grade arising out of the same facts." In this Grafton case the accused was acquitted on a homicide charge by a court-martial in the Philippine Islands and the civil courts thereafter tried and convicted him upon the same homicide, the latter judgment being reversed on a writ of error by the United States Supreme Court. It is not precisely in point on the question presented here, perhaps, but it goes to show that a court-martial, having jurisdiction, may

bar a further prosecution in the civil courts even though on a more aggravated charge growing out of the same act.

In United States v. Hirsch, 254 Fed. 109, 110, it is said, speaking of the articles of war prior to those now in force, that "under this law both courts-martial and civil courts necessarily respected the jurisdiction which was being exercised by the other, and the court first apprehending the defendant was thus able to proceed with a trial, without reference to the concurrent jurisdiction of the other. In the same way double jeopardy was avoided."

While the expressions in Caldwell v. Parker, supra, strongly appeal to us, and we would be inclined to give them effect in the instant case if we felt at liberty to do so, yet the language of the statute is so plain that we feel bound thereby, in view of the fact that the United States Supreme Court in the Caldwell-Parker case did not base its judgment on those reasons. It may be that Congress was unwilling to permit the civil courts to interfere with a criminal proceeding first started by the military authorities, save with the consent of the latter. It appears that the article stood substantially as it is now, but without the exceptions which we have italicized above, from 1776 until 1916 when they were first inserted.

One other point should be mentioned. The battalion in the instant case was demobilized on March 23, from which it is to be presumed the crisis had passed and the time of public danger was over. Not until after that, on March 25, did the prosecuting attorney institute his prosecution in the circuit court. But the statute, Section 13831, supra, makes the articles of war applicable "to offenses *committed* when such articles of war are so enforced." (Italics ours.) This being so, we are of the opinion that the court-martial, having obtained jurisdiction of the prisoner for trial of an alleged offense committed while the articles of war were in force, would not lose that jurisdiction merely because the exigency had passed.

From what has been said it follows that the prisoner should be remanded to the custody of the Adjutant General, and it is so ordered. All concur.