## THE STATE v. MARIANE CARIOU, Appellant.

### Division Two, November 30, 1915.

1. **EVIDENCE: Homicide: Corroboration of Irrelevant Statements.** Copies of a periodical and catalogue found among deceased's effects, the one advocating free love and the other containing a price list of articles designed to prevent conception, are not admissible for the purpose of corroborating defendant's testimony that she believed deceased had taken away her unmarried sister-in-law for immoral purposes, or of elucidating the state of her mind at the time she shot deceased.

2. **INSTRUCTION: Defining Heat of Passion.** An instruction for murder in the second degree is not erroneous because it does not define the phrase "heat of passion."

3. ————: **Homicide: Manslaughter in Fourth Degree: No Provocation.** The giving of an instruction for manslaughter in the fourth degree is authorized only when the evidence shows that an assault has been committed or personal violence has been inflicted upon defendant, either of which constitute what is termed "lawful provocation," the presence of which will reduce murder to manslaughter. But testimony that deceased had seduced defendant's unmarried sister-in-law, who had been a member of her household; that he had placed pernicious literature in her hands, that he had abducted her from defendant's home under promise of marriage and had returned without her, or his remark to defendant when she made inquiry concerning her sister-in-law just before the shooting that he had taken her to a place to have pleasure with her, is not evidence of lawful provocation, and will not authorize an instruction for manslaughter in the fourth degree.

4. ————: **Mental Incapacity: Covered by Others Given.** It is unnecessary to give an instruction submitting to the jury the question of defendant's mental capacity necessary to relieve her from liability for the commission of a crime, if the court has already at the request of the State given an instruction properly presenting the entire matter.

Appeal from Lafayette Criminal Court.—*Hon. John A. Rich,* Judge.

*H. F. Blackwell* and *Chiles & Chiles* for appellant.

(1) The court erred in giving instruction 6 at the request of the State, for the reason that said instruction uses the term "heat of passion" without defining the same therein and without defining it in other instructions. State v. Andrew, 76 Mo. 105; State v. Strong, 153 Mo. 555. Said instruction 6 is also open to the objection that no mention is made of "heat of passion" in the attempted application of the law to the fact of killing. (2) The trial court erred in refusing to give defendant's instructions upon manslaughter in the fourth degree.

*John T. Barker,* Attorney-General, and *Thomas J. Higgs,* Assistant Attorney-General, for the State.

(1) The periodicals and books found by the administrator as far as the evidence discloses had never been seen by the appellant or by Marie Cariou and could therefore have no bearing on the case. The refusal of evidence offered was not called to court's attention in the motion for new trial and is therefore not reviewable. State v. Johnson, 255 Mo. 287; State v. Foley, 247 Mo. 627; State v. Gilmore, 110 Mo. 1; State v. Headrick, 149 Mo. 404; State v. Harlan, 130 Mo. 394. (2) The court did not commit error by not defining "heat of passion" as used in the State's instruction defining murder in the second degree. There must be a request for an instruction to raise the question of court's failure to instruct. State v. Thompson, 250 Mo. 215; State v. Starr, 244 Mo. 183. Failure of the court to instruct on any subject must be mentioned in the motion for new trial. State v. McBrien, 178 S. W. 489; State v. Douglas, 258 Mo. 293; State v. Conners, 245 Mo. 482; State v.

Bostwick, 245, Mo. 486; State v. Dockery, 243 Mo. 592; State v. Conway, 241 Mo. 271. The instruction is more favorable to the appellant than necessary, and properly defines murder in the second degree. State v. Thomas, 78 Mo. 327; State v. Hudspeth, 159 Mo. 196; State v. Hyland, 144 Mo. 311; State v. Pleake, 178 S. W. 355. (3) The trial court properly refused to give defendant's requested instructions on manslaughter in the fourth degree. Appellant has cited a number of cases to the effect that there was a lawful provocation, and therefore an instruction on manslaughter in the fourth degree should have been given. • State v. Bulling, 105 Mo. 204. There is a distinction between lawful provocation and just provocation. Lawful provocation would permit an instruction on manslaughter, but just provocation would only reduce the homicide to murder in the second degree. Epithets, together with insulting gestures, constitute only just provocation, and therefore would not authorize an instruction for manslaughter. Words of reproach, however grievous, including indecent, provoking actions or gestures, are not sufficient to free the party killing from the guilt of murder. Provocation must consist of personal violence. State v. Finley, 245 Mo. 465; State v. Myers, 220 Mo. 598; State v. Sebastian, 215 Mo. 58; State v. Goldby, 215 Mo. 48; State v. Geisky, 209 Mo. 331; State v. Ballance, 107 Mo. 607; State v. Edwards, 103 Mo. 518; State v. Gordon, 191 Mo. 114. There must be considerable personal violence, or if slight, it must be accompanied by circumstances of indignity or an assault, actual or menaced, or words or gestures accompanied by some act indicating an intention to follow them up by an actual assault or violence to the person in order to justify an instruction on manslaughter. State v. Hanson, 231 Mo. 14; State v. Elliot, 98 Mo. 150; State v. Chamber, 87 Mo. 406; State v. Keene, 50 Mo. 357.

WALKER, J.—Appellant was indicted in Lafayette county for murder in the first degree in having shot and killed one Henri Herve. Upon a trial she was found guilty of murder in the second degree and sentenced to ten years' imprisonment in the penitentiary. From that judgment she appeals to this court.

The testimony for the State discloses that the appellant, Mariane Cariou, and the deceased, Henri Herve, lived at Summit Mine, near Lexington. The appellant lived with her husband and sister-in-law, Marie Cariou. The deceased boarded with Leon Peton. Deceased had been keeping company for some time with Marie Cariou. On March 27, 1913, a short time before noon, appellant came to Peton's and asked to see the deceased. Appellant came into the room where deceased and Amos, his roommate, were, and asked the former where Marie Cariou was and if she was in good hands. Deceased said that he had taken her to town and she was going to Pete Roland's. Appellant then went home. At about 12:30 or 1 o'clock p. m. the appellant came to the Peton home looking for deceased. Amos told her that he was not there. Albert Holm and John Llierberg were at the time passing through the Peton yard. Deceased came out of the cellar of Peton's house and was in front of Llierberg and Holm. Llierberg saw appellant run toward deceased, who was directly in front of Holm, with a revolver in her hand, and he called to Holm to look out. Holm thought that deceased was playing some trick on him, but turned and saw the appellant standing behind him with a revolver and immediately jumped to the side of deceased. Appellant at this time said, "He took my sister-in-law away," and deceased said, "You would not kill me for that." Appellant said, "Yes, I'll kill you." Deceased started to run and after he had gone four or five steps appellant shot him. He went four or five steps further, fell and died almost instantly. The shot entered

the left side of the back and came out the right side of the breast.

Leon Peton took the revolver away from appellant; there was one empty shell in it and four loaded ones. At the time of the shooting deceased had no weapon, nor was he resisting appellant in any manner.

Shortly before the shooting appellant called Florinda Fiora, a neighbor, over, and said she was going to kill that boy, meaning the deceased. The reason she gave for the intended kililng was that he was going to take Marie Cariou away. Mrs. Fiora told appellant not to kill him, but she answered that it didn't make any difference, she would kill him anyway. She had a pistol in her hand at the time. When she went to Peton's she had the pistol under her apron. Just before the killing deceased said not to kill him, that he was not the cause of it, and after he was shot he fell and said, "I am lost."

After the shooting appellant asked for a gun and said she wanted to kill herself. She tried to kill herself with an iron and an empty bottle.

Marie Cariou, twenty years old and a native of France, testified that she had been in this country about one year. She left the Cariou home on the morning before the killing, because she was not satisfied there. She told appellant she was going to Roland's on the evening before; that she intended to go to work for Roland. The deceased met her that morning and they got into a machine and went to the Gueguen home. Arrangements had been made for her to work at Roland's. Appellant brought her to this country and paid her expenses. A few days before she left her brother's he offered her $10 a month to remain there. She told him she did not want to stay. Deceased had never taken any liberties with her and quit visiting her on account of appellant's objections. Deceased had nothing to do with persuading her to leave and

she did not leave on his account. She was not satisfied, because appellant wanted to boss her too much. She would not let her go out with deceased or any one else. At one time she started out walking with deceased and went as far as the main road and appellant came after her. The night before the shooting she became en-gaged to deceased. He had asked her several times to marry him, but she would not give him an answer on account of the attitude of appellant.

The appellant went home after the shooting, got her little boy and started up the road toward town.

The evidence for the defense is substantially as follows:

Appellant testified that: In September, 1913, she went to France and returned in November, bringing her sister-in-law, Marie Cariou, with her. Marie Cariou began to go with deceased and appellant did not object until one day she found them locked in a bed room. When the door was opened Marie was sit-ting on the edge of the bed and Herve sat beside her. Appellant told her to come into the other room and deceased stayed in the bed rood. Marie, in answer to the question as to how it happened, said that she was weak and could not resist him. Deceased came to see Marie after that, but appellant would never leave her alone with him, and would not let her go out with him unless she accompanied them.

On the Wednesday before the shooting Marie talked with her about leaving. Appellant told her not to leave, that she would save her honor. She told ap-pellant she was going to work for Pete Roland. She left the house on the morning of the shooting with her valise. John Draulic came and told appellant that Marie and deceased had gone away in an automobile. Appellant said, ''Yes, they may have gone to get mar-ried,'' and Draulic said perhaps they have gone to Ro-land's. Later Draulic told appellant that deceased had returned without Marie. Then appellant went over

and asked deceased where Marie was. He told her it was not her affair, that he had not eaten her, but had taken her to a place to have pleasure with her. After this she became excited and remembered nothing. The next thing she rememberd was that she was in jail, and she asked a prisoner why she was in there, and he said it was because she had killed Henri Herve. Previous to the shooting appellant had been confined in bed for eight days and had gotten up only on the Tuesday before the shooting. Deceased had given Marie a book which was objectionable to the appellant.

John Draulic testified that appellant told him that deceased was a good boy and she liked him, but she was mad because Marie left home. The defense introduced testimony that deceased was the agent for a paper entitled, "Consciente Generation." The appellant objected to Marie reading this paper. The State showed that appellant read it frequently and was a subscriber to it, and the paper had been coming to her house addressed to her. She denied that she was a subscriber or that she read the paper. Marie Cariou, on rebuttal, denied that she had ever had any improper relations with deceased or that she ever so stated to appellant, or that appellant had ever found her locked in a room with the deceased.

I. Appellant complains of the refusal of the trial court to permit the introduction on the part of the defense of copies of a French periodical and catalogue found among the effects of the deceased; the first advocating free love and the limiting of population by the prevention of conception; the second containing a price list of instruments and articles to effect the last named purpose. It is contended this testimony should have been admitted to corroborate or give credence to appellant's testimony that she believed the deceased had taken

*Rulings on Testimony.*

Marie away for immoral purposes and hence the state of her mind at the time of the killing.

The reasons urged for the admission of this testimony that it afforded provocation for the killing is without support upon any theory of the case. There is no rule of evidence which permits the introduction of testimony to corroborate irrelevant statements, and as the periodical and catalogue had no legitimate probative force of themselves the contention is without merit, even if it had been preserved for review in the motion for a new trial, which was not done.

II. It is contended that the instruction for murder in the second degree was erroneous in not defining the phrase "heat of passion." What-

**Instructions.**

ever foundation there may be for this contention is based upon an inaccurate expression in State v. Andrew, 76 Mo. 1. c. 105, where it is said that an instruction for murder in the second degree is "subject to criticism" which does not define the phrase referred to. Despite this declaration, and it is nothing more, the instruction as given was held not to be prejudicial, for the reason that the phrase as there used was to be understood in the ordinary and not the technical sense of the words employed, and hence more favorable than otherwise to the accused. This being true, it is difficult to see in what respect it was "subject to criticism." The Andrew case, therefore, while it was inaccurate in expression, invoked the correct doctrine in regard to the use of the phrase in instructions defining murder in the second degree, but did not recognize the general application of the rule first announced in our reports in State v. Wieners, 66 Mo. 1. c. 25, that the phrase, when used in instructions defining that degree of homicide, was to be understood in the ordinary sense of the words, and indicated no more than a state of the mind different from that of a cool state of the blood.

A reference to the cases in which this question has been discussed is not inappropriate in this connection.

In State v. McKinzie, 102 Mo. 1. c. 627, it was held that the trial court should have defined "that heat of passion produced by a just cause of provocation which will reduce the homicide to murder in the second degree," no reason being assigned or case cited in support of this declaration.

In State v. Strong, 153 Mo. 555, the court declared an instruction for murder in the second degree erroneous because no definition was given of the words "in a heat of passion," citing in support thereof the Andrew case, which has been shown to be an authority to the contrary, and State v. Forsythe, 89 Mo. 667, and State v. Hickam, 95 Mo. 1. c. 330, in each of which the charge was for an assault with intent to kill. These cases have no reference to an instruction for murder in the second degree or to the use of the phrase in controversy, and are therefore incorrectly cited in support of the ruling in the Strong case.

The case of State v. Reed, 154 Mo. 1. c. 129, is not relevant, because the instruction discussed and held to be erroneous was for justifiable homicide and not murder in the second degree.

In State v. Lane, 158 Mo. 1. c. 584, the reason for the rule as stated in the Wieners case was recognized and a definition of the phrase was held not to be necessary.

State v. Skaggs, 159 Mo. 581, is not relevant, because the instruction condemned was for manslaughter in the fourth degree, the court holding that the phrase "heat of passion" should have been defined. This was a correct ruling; manslaughter is a crime recognized by the common law, and the phrase "a heat of passion," being one of the elements of same, when employed in an instruction descriptive of the offense, is to be understood in its technical sense and its definition becomes necessary; but murder in the second de-

gree is of statutory creation, and when the phrase is used in characterizing the offense it signifies no more than is indicated by the ordinary meaning of the words employed and requires no additional interpretation. This is the reason, and it is well founded, for the rule in the Wieners case.

State v. Pleake, 177 S. W. l. c. 357 (not to be officially reported), is not an authority here, because the instruction there complained of was for manslaughter in the fourth degree.

From all of which it will be seen that where the rule has been recognized and observed it has been held not necessary to define the phrase in instructions for murder in the second degree and that rulings to the contrary have been arbitrarily made without any reason assigned therefor, and they are consequently not authorities to sustain appellant's contention. We therefore overrule it.

Appellant complains of the refusal of the trial court to give an instruction for manslaughter in the fourth degree. The giving of this instruction, under many precedents, is only authorized when it is shown that an assault has been committed or personal violence inflicted upon the defendant, either of which constitute what is termed "lawful provocation," the presence of which will reduce murder to manslaughter. [State v. Ellis, 74 Mo. 207; State v. McKenzie, 177 Mo. l. c. 712; State v. Weakley, 178 Mo. l. c. 423; State v. Todd, 194 Mo. l. c. 396; State v. Darling, 199 Mo. l. c. 197; State v. Conley, 255 Mo. l. c. 198; State v. Snead, 259 Mo. l. c. 432.]

The facts contended by the appellant to be necessary to constitute lawful provocation and hence authorize the giving of the instruction, are as follows: the alleged seduction of Marie Cariou by the deceased; the placing in her hands by him of pernicious literature; her abduction by him under·promise of marriage; his return without her; and his remarks to ap-

pellant when she made inquiry concerning her. To hold that these facts are sufficient to authorize the giving of the instruction would be to overturn all precedent and in effect sanction the taking of the law by the appellant into her own hands to inflict such punishment as she deemed adequate to the injury she felt she had sustained. The inculcation of the doctrine this contention seeks to establish is pernicious in the extreme and, if approved, could not be otherwise than detrimental to the well being of society. Its establishment would result in the substitution of the vendetta and the right of personal reprisal for the orderly procedure of the courts in the administration of the criminal law.

There was no evidence authorizing the giving of instructions on accidental killing and justifiable homicide.

Appellant complains of the refusal of the trial court to grant an instruction submitting to the jury the question of the appellant's mental incapacity necessary to relieve her from liability for the commission of the crime. The giving of this instruction was unnecessary in view of the fact that the court had given an instruction at the request of the State properly presenting to the jury this entire question.

The record discloses that the appellant has been accorded every right to which she was entitled under the law. She was fortunate in being represented by able and industrious counsel, who have left nothing undone to present every possible defense that could properly be interposed in her behalf for the commission of this unprovoked murder. The jury would have been authorized under the evidence in finding her guilty of murder in the first degree.

The freedom from error of this record authorizes an affirmance of the judgment of the trial court, and it is so ordered. *Revelle, J.,* concurs; *Faris, P. J.,* not sitting.