## THE STATE v. JAMES LIOLIOS, Appellant.

### Division Two, December 1, 1920.

1. **SANITY OF DEFENDANT: Opinion of Laymen: Facts Upon Which Based.** A lay witness, called to prove that a certain individual was insane, must, before expressing his opinion, state the facts upon which his opinion is founded. But where the lay witness is called to prove that such individual is sane, the rule is different, and the witness can express such opinion without stating in advance the facts upon which his opinion is based.

2. **EXPERT: Competency.** Any witness, otherwise qualified, who, by study and experience (but not by observation alone), is shown to have acquired and to possess skill, knowledge or learning upon the subject under investigation, such as is not commonly had by persons in the ordinary walks of life, and which will aid and is necessary to aid the jury in rightly determining the particular matter under investigation, is competent to testify as an expert upon the subject, even though he declares himself not to be an expert.

3. ———: ———: **Weight.** The extent and character of the special learning, knowledge or skill of the witness, how it is derived and

upon what it is based, are matters bearing upon the weight to be given to his testimony, which is a question for the jury to decide, but they do not affect his competency to testify, which is a matter for the court to decide, in spite of the fact that the witness states he is not an expert.

4. ———: Insanity. It is error in a criminal case to refuse to permit a witness who is shown to be competent as an expert, to testify that temporary insanity may be brought on by grief and continuous study over one particular subject, coupled with loss of sleep and food.

5. HAPPY DOMESTIC LIFE: Competency. Where defendant is charged with murdering his wife, testimony that they had lived happily during their whole domestic life and that he had always been a devoted, indulgent and loyal husband, is competent, (1) as bearing on the question of motive, (2) to show the probable effect upon his mind when he found his home broken up and his wife in the act of deserting him to go to her paramour, and (3) as affording a basis of fact for the opinion of the witness that he was insane at the time he fired the fatal shot.

6. MANSLAUGHTER: Instruction. Where defendant, in a frenzied state of mind, suddenly shot his wife, when he discovered she was about to leave his home to go with her paramour and she had taunted him, an instruction on manslaughter in the fourth degree should not be given.

7. INSTRUCTIONS: On All Law of Case. An assignment in the motion for a new trial that "the court especially erred in not instructing the jury on all the law of the case necessary for their information and guidance in arriving at a verdict" is so vague as to be valueless and saves nothing for review.

8. ———: On Murder In Second Degree. Whether the homicide is or is not characterized by deliberation is a question of fact to be decided by the jury under a proper instruction; and if the facts in evidence, even though produced by defendant alone, are such that a question exists as to whether or not the killing was deliberately done, then an instruction on murder in the second degree should be given.

9. ———: ———: Words as Provocation. Taunting words, uttered immediately preceding the murderous act and under such circumstances as to suddenly engender frenzied passion and excitement, may reduce the homicide from murder in the first degree to murder in the second degree.

10. ———: ———: Justice and Right of Matter. The homicide may be committtted under such circumstances that instructions which

State v. Liolios.

leave the jury no choice except to find defendant guilty of murder in the first degree or acquit him outright on the ground of insanity violate the very right and justice of the matter, And justice required that under the circumstances of this case an instruction on murder in the second degree be given.

11. ———Testimony Against Interest. The familiar instruction relating to statements against interest made by defendant, if it does not distinguish between statements made by him out of court and those made by him in testifying in his own behalf, is erroneous. And in instances where the statements said to have been made by defendant rest in parol only, the wisdom of giving such an instruction at all may be gravely doubted, although the giving of it has not been held to be reversible error.

12. ———: Insanity as Defense. An expression as a beginning to an instruction for the State that "in this case insanity is interposed by defendant's counsel as an excuse for the charge set forth in the information," although the instruction is otherwis in proper form, is unnecessary and an unfortunate expression in a case in which temporary insanity at the time of the commission of the crime charged is interposed as a defense, since it might readily be understood by the jury, especially the words "by defendant's counsel," in a sense highly prejudicial to the accused.

Appeal from Butler Circuit Court.—*Hon. Almon Ing,* Judge.

REVERSED AND REMANDED.

*Henson & Woody* for appellant.

(1) The opinion of a lay witness as to the sanity or insanity of a person is only competent after acquaintance and frequent association is shown, and then all facts upon which the opinion is based must be detailed by the witness, and, unless this is done, such testimony is incompetent. Hunter v. Biggs, 254 Mo. 54; State v. Morris, 263 Mo. 349; State v. Erb, 74 Mo. 205; State v. Speyer, 194 Mo. 469; State v. Williamson, 106 Mo. 170; People v. Phipps, 268 Ill. 210; People v. Strait, 148 N. Y. 566; Mull v. Carr, 5 Ind. App. 491. (2) It was competent for Dr. Seybold to testify as to the causes

of temporary insanity and especially so after he had stated that he knew some of them. The action of the court in excluding this testimony and its comments relative to same were highly prejudicial to the defendant. State v. Speyer, 194 Mo. 472; State v. Rose, 271 Mo. 17; State v. Daly, 210 Mo. 676. (3) The court erred in excluding the testimony offered by defendant concerning his domestic life from the date of his marriage up until the time of the tragedy, the manner in which he treated his wife and children during this time, the affection he bore for his wife and she for him, his affection for his children and his attachment to his home. These were all circumstances which should have gone to the jury as throwing light upon his mental condition at the moment of firing the fatal shot. Baldwin v. State, 12 Mo. 149; State v. Speyer, 194 Mo. 469; State v. Kring, 64 Mo. 591; State v. Porter, 213 Mo. 59; State v. Speyer, 182 Mo. 77; State v. Speyer, 207 Mo. 540. (4) Instruction numbered 3 is erroneous for the reason that it injects the question of general insanity into the case where there is no such issue tendered and because it fails to instruct the jury on temporary insanity. (5) Instruction No. 4, as requested by defendant, properly declared the law applicable to the issues in this case, and the court should not have modified said instruction by striking out all the reference to "insane impulse" with a pencil and leaving the same so the jury could still read the parts stricken out. This was equivalent to instructing the jury that "insane impulse" was no defense in the case when, as a matter of law, it is a complete defense. The court evidently confused and confounded the term "insane impulse" with irresistible impulse" or "uncontrollable impulse," neither of which are defenses to crime. State v. Duestrow, 137 Mo. 71. (6) One cannot legally be convicted of murder in the first degree where the killing was done under excitement and passion. Instruction numbered seven should not, therefore, have been given, as it tells the jury that excitement and passion do not even mitigate defendant's act, as a matter of law, such condi-

State v. Liolios.

tion of mind would reduce the act to manslaughter in the fourth degree. There was no evidence of ''hatred'' in the case and this term should not have been included in the instruction. R. S. 1909, secs. 4448, 4468; State v. Birks, 199 Mo. 276; State v. Campbell, 210 Mo. 229; State v. Holme, 54 Mo. 165; State v. Edwards, 70 Mo. 483; State v. Ellis, 74 Mo. 215; State v. Conley, 255 Mo. 185; State v. Grugin, 147 Mo. 39; People v. Bowen, 130 N. W. (Mich.) 706. (7) The question of just cause or provocation to produce heat of passion is a mixed question of law and fact, and, if found sufficient, it reduces the crime which would otherwise have been murder to manslaughter. Instruction No. 8 is erroneous because it declares as a matter of law that infidelity of the wife and the belief thereof by the husband is not just provocation, and, in effect, tells the jury that if defendant is guilty at all he is guilty of murder in the first degree regardless of provocation. State v. Stewart, 204 S. W. 14; State v. Grugin, 147 Mo. 39; People v. Bowen, 130 N. W. 706; People v. Wood, 126 N. Y. 249. (8) Where insanity is interposed as a defense to an alleged crime, the inquiry is limited to the single question of the capacity of the one charged to distinguish between right and wrong, at the time the act was committed, therefore, Instruction A, requested by the defendant should have been given, and its refusal is error prejudicial to the defendant. (9) The court should have instructed the jury on manslaughter in the fourth degree. R. S. 1909, sec. 5231; State v. Stewart, 212 S. W. 855; State v. Webb, 205 S. W. 190; People v. Wood, 126 N. Y. 249; State v. Lackey, 230 Mo. 720.

*Frank W. McAllister*, Attorney-General, and *J. W. Broaddus*, Assistant Attorney-General, for respondent.

(1) It is the well settled law of this State, shown by the cases cited by appellant, that persons who are not experts, but who have had favorable opportunities for ascertaining, by observation, the facts, can testify as to

their opinion touching the defendant's insanity. These witnesses testified that they had known appellant several years; that they saw him almost every day before the shooting of his wife and that they were well acquainted with him and that from his conduct they would say he was sane. They were in a position to give an opinion as to appellant's sanity. Moore v. Moore, 67 Mo. 192; State v. Bryant, 93 Mo. 273. (2) The court did not err in refusing to permit Dr. Seybold to testify as an expert. While he had had twenty-six years' experience as a general practitioner, there was no showing that he was sufficiently qualified to testify as an expert on insanity. State v. Bell, 212 Mo. 112. It is a matter resting largely in the discretion of the trial court as to whether or not a witness is properly qualified to give testimony as an expert and an appellate court will not reverse a case on account of a mistake of judgment on the part of the trial court except in an extreme case. 22 C. J. p. 526; Rodgers on Expert Testimony (2 Ed.), par. 22; 1 Wharton's Criminal Evidence (10 Ed.), p. 83. (3) The trial court permitted appellant to show the facts concerning his domestic life during a reasonable length of time prior to the killing of his wife. We are satisfied that when the court reads the evidence of the witness Minnie Travis, it will see that all the facts concerning appellant's domestic life which had a tendency to throw any light on the condition of his mind at the time of the homicide were admitted. Underhill Criminal Evidence (2 Ed.), par, 159; Sanchez v. People, 22 N. Y. 147. (4) Instruction 3 given by the court correctly declared the law in reference to a case of this kind. This instruction has many times been before this court. In one instance this court said it expressed in a "lucid manner, the well established law of this State." State v. Pagels, 92 Mo. 314; State v. Holloway, 156 Mo. 228; State v. Duestrow, 137 Mo. 69, 70. (5) The court did not err in modifying appellant's Instruction No. 4 by striking out all reference to the term "insane impulse." The doctrine of "insane or uncontrollable impulse" has been expressly repudiated by the

courts of this State. Under our decisions the question is, did defendant know "right from wrong?" State v. Williamson, 106 Mo. 173; State v. Miller, 111 Mo. 551; State v. Soper, 148 Mo. l. c. 236; Markland v. Casualty Co., 209 S. W. 606; State v. Riddle, 245 Mo. 458; State v. Dunn, 179 Mo. 115. (6) Instruction 7 given by the court has been held by this court to be a proper instruction in a case of this character. State v. Paulsgrove, 203 Mo. 201. (7) There is no merit in the objection to Instruction 8 given by the court. It told the jury that if deceased, Tula Liolios, was unfaithful to her marriage vows, and defendant so believed, and so believing killed her, or if he killed her because of jealousy he entertained towards her, this was not sufficient or just cause or provocation. It correctly declared the law. State v. Anderson, 98 Mo. 473; State v. Burns, 148 Mo. 173. (8) Instruction 10 complained of by appellant was correct. Of this instruction this court has said: "It has been approved so often in this State that we must decline to enter upon its defense. It has proven to be a good workable instruction for many years, is not calculated to mislead a jury, and continues to command our approval." State v. Darrah, 152 Mo. 530; State v. Tobie, 141 Mo. 561; State v. Nibarger, 255 Mo. 293, 298. Instruction 10 is entirely different from the one before the court in the case of State v. Finkelstein, 269 Mo. 612, and to which the cases cited by appellant under this point refer. (9) The court did not err in failing to instruct the jury on manslaughter in the fourth degree. The evidence tended to prove a deliberate, premeditated case of murder in first degree. Before an instruction on manslaughter can be given it must appear from the evidence that there was reasonable provocation for the act of defendant, which was wholly absent in this case. State v. Stewart, 212 S. W. 855; State v. Webb, 205 S. W. 190. This question is not before this court for the reason that the record fails to show that defendant excepted at the time to the failure of the trial court to instruct on manslaughter in the fourth degree or on all necessary questions of law arising at the trial.

State v. George, 214 Mo. 262; State v. Pfeifer, 267 Mo. 29; State v. Cook, 207 S. W. 833. (10) While it is true that the plea of insanity does not admit the grade of the crime yet the evidence in this case clearly tends to show the commission of but one offense—that of murder in the first degree and no other.

WILLIAMSON, J.—The defendant, James Liolios, was convicted of the crime of murder in the first degree and sentenced to imprisonment for life in the penitentiary. From this judgment, by proper steps, he has appealed to this court. The defense was insanity on the the part of the defendant.

The evidence in behalf of the State tended to show that defendant was a married man, engaged in business in Poplar Bluff, Missouri, and that he lived with his wife and their two small children and his wife's mother, on the second floor of the Central Hotel in Poplar Bluff; that on the 13th day of January, 1919, the defendant shot and killed his wife in one of the rooms occupied by them in the Central Hotel; that the shooting was done with a revolver which defendant had purchased on the day of the killing and only a short time before the fatal shot was fired; that deceased was shot in the head, and died immediately thereafter from the effects of the wound; that but one shot was fired; and that defendant immediately thereafter surrendered himself to the officers of the law, and stated to them and to other persons at the time that he had killed his wife. The evidence for the State further showed that on the day of the homicide defendant had rented a safe-deposit box from a local bank and had deposited some papers therein, and that later in the day and a very short time before the shooting occurred defendant had removed these papers from the box. This is the substance of the evidence in chief in behalf of the State. None of these facts was denied by the defendant.

The evidence in behalf of the defendant is remarkable in many respects, not the least remarkable phase

of it being that the mother of the victim of the tragedy appeared as the principal witness in behalf of the accused. This evidence, cast in narrative form, is in substance as follows:

The defendant, a Greek, and his wife, apparently American-born, had been married about six years before her death. Two children had been born to them. During the whole of their married life they had lived in Poplar Bluff. Mrs. Minnie Travis, the mother of the deceased, had lived with them during all of that time. Mrs. Travis was about sixty-five years of age, and apparently a widow. About three weeks before the deceased was killed, one Harry Thomas, a plumber from St. Louis, came to Poplar Bluff to work on a building being erected near the Central Hotel, and boarded at that hotel during his nine-days stay in Poplar Bluff. In this way Thomas became acquainted with the deceased, who was a young woman, and the acquaintanceship seems swiftly to have ripened into a criminal intimacy. There is no direct proof that this intrigue had progressed to the extent of illicit sexual intercourse, but there are numerous circumstances which cogently point to that conclusion. It appears that on one occasion Thomas's employer, finding him absent from his work, had gone in search of him and had found him at the Central Hotel in a room alone with Mrs. Liolios. This same witness talked with the deceased about her relations with Thomas, and she admitted to him that she was infatuated with Thomas and intimate with him. It further appeared that Thomas learned, or at least suspected, that the defendant had become aware of this amour, and thereupon, before the work upon which he was engaged was finished, Thomas left Poplar Bluff and returned to St. Louis. From the latter city, Thomas addressed to defendant the following letter:

State v. Liolios.

"St. Louis, Mo. Jan. 1, 1919.

"Mr. James Liolios,
    Poplar Bluff, Mo.
    "Dear Jim:
        "No. doubt you will be surprised to hear from me. Now James I thought you was going to drop this business for I told you when you were here .that I had realized where I had done you and Mrs. Liolios a great wrong; and I. told you that I was heartily sorry for what I had done. And James, I still want you to believe me when I tell you I am sorry for I am, but now the last two days there has been a man who is a stranger to me following me around, and to-night he tried to get me but I was a little two quick for him and got out of his way.

        "Now James you know I could put the police onto this fellow and cause some trouble but I don't do that-way. James I don't know if this is some fellow you have got to get me or not, but I do want you to tell me at once if he is a friend of yours; if he is, I will try and stay out of his way, but if he is not I won't answer for him, so please let me know at once if you know about this man. Now James I hope & pray that you will *forgive* and forget and let us all start the New Year in Peace & Happiness, but I want to say again that I am heartly sorry for the mean way I done you, and I hope I can repay in full for the sorry I have caused. Now James let me know at once if this man is a friend or relative of yours before it is to late.

                                    "Harry, 4137-a Evans Ave."

On the day following this letter Thomas sent defendant a post-card which read as follows:
Addressed:

            "Mr. James Liolios,
                Poplar Bluff, Mo.
c/o Central Hotel.

                                "St. Louis, Mo. Jan. 2, 1919.

"Mr. Jas. Liolios,
    "Dear Sir:
        . "If you write please address my mail to Navarre Hotel, 7th & 38th St., New York.

                                        "H. T."

Notwithstanding this contemplated early ` removal to New York, it appears that on January 11, 1919, Thomas was still in St. Louis, and had decided not to go to New York, for on that date, under a fictitious name, he wrote to the deceased as follows:

State v. Liolios.

"St. Louis, Mo. Jan. 11, '19.

"Dear Little Girl:

"Your letter just received and I was more than glad to hear from you; but you know that it is two risky for you to write me; dear, please do as I ask you, and some day things will be different. Clara is expecting to be sick today. I burnt that letter so you do the same. I just happened to go down to the store this morning and the letter was there. I am working at pipe fitting again and I am going to stay here. I got the letter that he wrote me and it sure was a hot one. Dear, be sure and let me know if he comes to St. Louis, for I don't like to be surprised. Now, don't write to often, for it is to dangerous for you, but I like to hear once in a while how you are getting along; so, just be good and have patience and some day things will be different. Please excuse paper for I am down town writting.

So, by, by, for now, Dear, and God bless you.

As Ever

I get my mail at 1402."

All of these communications came to the hands of the defendant in the due course of the mails, a few days prior to the tragedy, and all were identified as being in the handwriting of Thomas.

It appears that about two weeks before the killing occurred a change became apparent in the manner of the defendant. He became unable to attend to business, was unable to eat or sleep; he appeared upon the streets pacing back and forth without speaking to friends whom he knew intimately, his manner intensely nervous, and his demeanor that of a man distraught. His nights were passed in walking the floor of the apartments occupied by himself and wife, and in pleading with her, weeping as he plead, to abandon her relations with Thomas and to remain at home with her husband, her mother and her children. The mother of the deceased joined in these entreaties, but apparently without avail.

On the day of the homicide, the deceased had determined to go to St. Louis, on a train which apparently left Poplar Bluff about four o'clock in the afternoon. In the forenoon of that day defendant had rented a safe-deposit box in a local bank and had put certain documents in it. About three o'clock that afternoon he appeared at the bank and removed these documents, which were, apparently, the letters and postcard above men-

tioned. He then went to a hardware store across the street from the Central Hotel and purchased a revolver and some cartridges, preparatory to going to St. Louis for an interview with Thomas. Neither the attendant at the bank nor the clerk at the store was asked to describe the appearance or demeanor of defendant at these times, nor did either volunteer any information upon these topics. Defendant then went upstairs to his apartment in the hotel and found his wife sitting in a chair holding her baby in her lap. She was dressed in traveling clothes. Her mother was in another room on the same floor of the hotel, a short distance away from the room in which defendant found his wife. Defendant renewed his entreaties to his wife to abandon Thomas and her relations with him, and continued to plead with her—"praying," as defendant expressed it—until finally she said: "Your prayers don't do you any good; God can't do you any good; don't waste your breath," whereupon defendant took his revolver from his pocket, shot his wife once in the head, turned and ran down the stair, announcing to some persons whom he met on the stair that he had shot his wife, went down the street to where a deputy sheriff was standing and informed that official of what he had done, and asked to be arrested.

After being shot, the victim of the tragedy leaned back in her chair and immediately afterwards was lifted to a near-by bed by some persons who were attracted by the sound of the shooting, and died at once.

The defendant also showed that for several weeks prior to the tragedy his conduct toward his wife had been kind and affectionate, and that he provided her with all that she wanted; that he loved his wife, his family and his home. He also offered, but was not allowed, to prove that during the entire period of his marriage he had been an affectionate, loyal and devoted husband and father, and that his home had been a happy one until it was broken up by the events above set forth. Defendant also showed that his reputation as a peaceful law-abiding man was good.

On the cross-examination of the mother of the deceased, the State brought out the fact that, when a few days after the killing, the defendant was brought out of jail for his preliminary hearing, she, the mother of the deceased, went up to defendant upon the street, and kissed him. A number of lay witnesses expressed the opinion, based on observation, that defendant was insane at the time the homicide was committed, and two others, the sheriff and his deputy, testifying in behalf of the State, swore to the contrary. An attempt was made to introduce some expert evidence on this subject.

Some further facts may appear in the body of the opinion. We have set out the facts somewhat fully on account of some of the questions which are presented for our consideration. These questions relate chiefly to rulings on evidence, and to the instructions.

I. Appellant's first assignment of error relates to the testimony of two witnesses offered by the State upon the question of the sanity of appellant. These two witnesses were the sheriff and deputy sheriff of Butler County. Both testified that the appellant, at

**Sanity of Defendant: Opinion of Laymen.**

the time of the commission of the offense charged, was sane. Their testimony as set forth in this record rests apparently upon very slight knowledge. The objection urged by appellant to this testimony is that the witnesses were not required to state in advance the facts upon which their opinions were based. In this contention we think the appellant is in error. The rule with respect to this matter is that where a lay witness is called to prove that a given individual was insane, then such witness must, before expressing his opinion, state the facts upon which that opinion is founded. [State v. Speyer, 194 Mo. 459, l. c. 469; State v. Morris, 263 Mo. 339, l. c. 350; State v. Bell, 212 Mo. 111, l. c. 125.]

The rule is the same in civil cases. [Messick v. Warren, 217 S. W. 94, l. c. 98; McFarland v. Brown, 193 S. W. 800, l. c. 805; Thomasson v. Hunt, 185 S. W. 165, l. c. 168.]

The rule is otherwise, however, where the witness is called to testify that the person whose mental condition is under inquiry is sane. [State v. Soper, 148 Mo. 217, l. c. 235.] The reason for this distinction is said to lie in the fact that the sane mind is not characterized by the vagaries and eccentricities which mark the minds and color the conduct of the insane.

We accordingly overrule this assignment.

II. Appellant also assigns error in the action of the trial court in excluding the testimony of Dr. Ira W. Seybold, who was called by the defense to testify as an expert concerning the causes which can or may produce temporary insanity. To set out the examination of this witness in full would be to encumber the record uselessly, but it may be summarized as follows:

Competency of Expert.

Concerning his qualifications as an expert, he testified in substance that for twenty-six years he had been engaged in the general practice of medicine and surgery; that he was a graduate of the Baltimore Medical School; that he had had occasion to observe different kinds of insanity and had had several insane patients, probably a dozen or more, in the course of his practice, and had studied them closely. Counsel for appellant then inquired whether or not "temporary insanity is ever brought on by grief, continuous study over one particular subject, coupled with loss of food and sleep?" To this question counsel for the State objected on the grounds that the witness had not shown himself to be qualified. This objection was sustained, and counsel for appellant then in substance offered to prove that the witness would, if permitted to answer, testify that temporary insanity could be so induced. Substantially the same question was thereafter propounded to the witness in various forms, and in each instance the objection thereto was sustained and the witness was not permitted to answer. Further in the examination of this witness, he was asked to state some of the causes of temporary insanity and whether or not continual and extended wor-

ry over a subject in which the party was deeply interested could produce temporary insanity. Objections to these questions were also sustained. Exceptions were duly saved to all of these adverse rulings. In so holding we think it clear that the learned trial court erred. Any witness, otherwise qualified, who, by study or experience (but not by observation alone), is shown to have acquired and to possess special skill, knowledge or learning upon the subject under investigation, such as is not commonly had by men in the ordinary walks of life, and which will aid and is necessary to aid the jury in the particular matter under investigation, is competent to testify as an expert upon that topic. The extent and character of his special learning, knowledge or skill, how it is derived and upon what it is based, are matters bearing upon the weight to be given his testimony, which is a question for the determination of the jury, but these questions do not affect the competency of the witness. The ruling below seems to have been influenced to some extent at least by the declaration of the witness that he was not an expert. The decision of that question was for the court, not the witness. Trial courts have a wide discretion in such matters, but their discretion is not absolute. It is subject to appellate review. In a similar situation in a civil case, BURGESS, J., speaking for the court, said:

'"It is insisted that the court erred in permitting Dr. Yarnell, a witness for the plaintiff, to testify over defendant's objections, as an expert, to the effect that the blow could have caused the condition he found plaintiff's lung in at the time when he treated him after the injury, without it being shown that he was qualified as such, and after he had stated that he was not an expert on lung trouble.

"This witness has been a practicing physician for twenty-five years. He stated that he was not a specialist for lung trouble, and, not being an expert in that line, he turned him (plaintiff) over to Dr. Foster. All the witness stated was that he was not an expert in the

treatment of consumption. He was clearly as competent, from his long experience as a practitioner, to give his opinion as to the cause of the consumption in plaintiff, as he was to give his opinion as to the cause of any other disease in any of his patients, although he may not have had any experience in the treatment of such disease.'' [Seckinger v. Mfg. Co., 129 Mo. 590, l. c. 606.]

To the same effect are the cases of State v. Rose, 271 Mo. 17, l. c. 26, and State v. Daly, 210 Mo. 664, l. c. 676. See also Gillett on Indirect & Collateral Evidence, p. 261; Lawson on Expert & Opinion Evidence, p. 229. It is not necessary that the witness should be a specialist, nor even that he should hold a medical diploma. [22 C. J. p. 675.] That the witness was competent we think admits of little question. That the evidence sought to be obtained from this witness was also competent, is, we think, equally obvious.

''Again, it is not inappropriate to suggest that the questions propounded to the experts, Drs. Burnett and Hanawalt, as to whether or not excessive fright, pain, sorrow, pleasure or joy would entirely prevent thought from taking place, were proper questions to be propounded to experts who were introduced by the State or the defendant to testify upon the subject of insanity. The propriety of these questions does not rest upon the theory that a foundation must be laid in order to authorize the propounding of them, nor are they to be regarded as hypothetical questions requiring testimony to be introduced as a basis for the asking of them. These questions stand as independent preliminary questions to experts, and the appellant had the right to fully inquire in respect to their knowledge of the subject about which they proposed to testify, and if the appellant's theory of this case was that he was insane by reason of excessive fright, pain, sorrow or any other cause, even before any testimony had been introduced along that line, he had a perfect right to make inquiry of the experts as to

what their knowledge was as to the causes which would produce insanity. It certainly will not be seriously contended that when an expert is first placed on the stand it would be incompetent to ask him the question as to what are the usual and most frequent causes of insanity, and on the same principle it is not objectionable to ask an expert when on the stand if certain conditions surrounding an individual have a tendency to prevent thought or produce mental incapacity." [State v. Speyer,. 194 Mo. 459, 1. c. 472.]

Appellant's contention upon this assignment is sustained.

III. Appellant's next assignment of error is that the court erred in refusing to permit him to show that, except for a short time prior to her death, he and his wife had lived happily during their whole domestic life and that he had always been a devoted, indulgent and loyal husband. Numerous witnesses to these facts were introduced by him, but upon objection by the State, their testimony was excluded, and the inquiry was confined to a period of a few weeks prior to the tragedy.

Previous Happy Life.

We are at a loss to imagine upon what theory this evidence was excluded. One of the witnesses by whom appellant proposed to prove these facts was the mother of the deceased. She had lived with her daughter and son-in-law during their entire married life. The fact that appellant was happily. married was material as bearing upon the question of motive. It also tended to show the extent of his loss and its probable effect upon his mind when he found his home broken up and his wife in the act of deserting him to go to her paramour. Certainly such a condition as confronted appellant would be more apt to dethrone the reason of a man who was a loving and loyal husband, theretofore blessed, as he supposed, with a faithful and affectionate wife, than to have that effect upon a husband who cared nothing for a wife, who, in turn, cared nothing for him. A wife's desertion

might well be received with equanimity or hailed with joy by a husband who was longing to be rid of her. The same act might well bring frenzy to the brain of a husband who looked upon his wife as Othello regarded Desdemona when he said,

"Oh, thou weed! Who art so lovely fair, and smell'st so sweet, That the sense aches at thee, would thou hadst ne'er been born."

Again, this witness was called upon to testify to the insanity of appellant at the time of the homicide, and did so testify. Her opportunity for observing him, particularly in his domestic relations, and the fact that she did so observe him, and the result of that observation, were all pertinent and important facts to be given in evidence to lend weight to her opinion as to his mental condition when he fired the fatal shot. [State v. Speyer, 194 Mo. 459, l. c. 469; State v. Porter, 213 Mo. 43, l. c. 59, and authorities cited under point one hereof.]

We think this evidence and that of other witnesses to the same effect should have been admitted.

IV.    Appellant contends that the trial court erred in failing to instruct the jury upon manslaughter in the fourth degree. Appellant made no request for such an instruction, nor did he in his motion for a new trial assign the failure to give such an instruction as error. Under numerous decisions we might well hold that appellant cannot now complain of the failure so to instruct. [State v. Dockery, 243 Mo. 592, l. c. 599; State v. Crofton, 197 S. W. 136, l. c. 138.] We have, nevertheless, examined the record carefully with this point in mind, and have come to the conclusion that under the firmly established doctrine prevailing in this State, the facts in this case do not warrant the giving of an instruction on manslaughter in the fourth degree. [State v. Heath, 221 Mo. 565, l. c. 584; State v Sharp, 233 Mo. 269, l. c. 290; State v. Cariou, 266 Mo. 82, l. c. 91; State v. Shuster, 183 S. W. 296.]

Manslaughter.

V. In his motion for a new trial appellant alleges, as one of the grounds upon which the motion is based, that "the court especially erred in not instructing the jury on all of the law of the case neces-

On All The Law.

sary for their information and guidance in arriving at a verdict."

It has been repeatedly held that this allegation in a motion for a new trial is so vague as to be valueless, and that it saves nothing for a review. [State v. Dockery, 243 Mo. 592, l. c. 599; State v. Conway, 241 Mo. 271; State v. Price, 263 Mo. 276, l. c. 279.] Notwithstanding the authorities above cited, which would, perhaps, have justified us had we declined to consider this matter further, we have read this record with care and have come to the conclusion that the ends of justice will be better served if we call attention to some matters in which we think the trial court failed to safeguard fundamental rights of the defendant. This cause must be reversed and remanded in any event, and that is an additional reason for calling attention to the following considerations.

Touching the duty of trial courts in criminal cases, we have a statute, portions of which are apposite: "Whether requested or not, the court must instruct the jury in writing upon all questions of law arising in the case which are necessary for their information in giving their verdict; which instructions shall include, whenever nec-

Murder in Second Degree.

essary, the subjects of good character and reasonable doubt; and a failure to so instruct in cases of felony shall be good cause, when the defendant is found guilty, for setting aside the verdict of the jury and granting a new trial." [Sec. 5231, R. S. 1909.]

The question which we have in mind is the failure of the trial court to give an instruction upon murder in the second degree.

As bearing upon the propriety of such an instruction in this case, a brief resume of some of the facts will

be helpful, even at the expense of repetition. The evidence in behalf of appellant shows that a few days before the tragedy occurred he had become aware of his wife's infatuation for one Harry Thomas; that appellant had information which justified him in believing that she was untrue to him; that up until that time appellant and his wife had lived happily together, and that he was devoted to her; that after learning of her misconduct he was greatly distressed, but nevertheless, for about ten days prior to the homicide, with a forbearance which is more frequently praised than practiced, he had earnestly been pleading with his wife, with prayers and tears, to abandon the intrigue in which she had become entangled, but without success; that on the day of the homicide, or, perhaps, on the day before, he had intercepted a letter, couched in endearing terms, from Thomas to the deceased; that appellant then resolved to go to St. Louis and "get" Thomas; that for that purpose, a few hours before the tragedy and on the same day, he purchased the revolver with which the killing was done; that before starting upon this errand he went again to see his wife to renew his entreaties; that he found his wife in traveling costume; that she cynically rejected his appeals, advised him not to waste his breath, informed him that his prayers didn't do him any good and that God couldn't do him any good; told him that she was about to depart for St. Louis upon a train then almost due, and started to rise from the chair in which she was then sitting. Appellant thereupon shot her then and there. He testified that he never had any intention of killing his wife; that he loved her and that he loved her yet.

Now the fundamental distinction between murder in the first degree and murder in the second degree is that deliberation is an essential element of murder in the first degree, but that when deliberation is lacking, the crime is murder in the second degree, at the most.

"What, then, is murder in the second degree? It is the wrongful killing of a human being with malice

aforethought but without deliberation. It is, where the intent to kill is, in a heat of passion, executed the instant it is conceived or before there has been time for the passion to subside. We do not use the phrase 'heat of passion' in its technical sense, but as a condition of mind contra-distinguished from a cool state of the blood. Take the case of A and B, who had been on friendly terms, but they have an altercation in which A calls B a liar, and with a pistol or other deadly weapon B instantly, in a passion engendered by the insult, kills, him. This, at common law, was murder, but, lacking the element of deliberation, it is, under our statute, murder in the second degree." [State v. Wieners, 66 Mo. 13, l. c. 24.]

"Where there is a willful killing with malice aforethought, that is, with malice and premeditation, but not with deliberation, or in a cool state of the blood, the offense is murder in the second degree." [State v. Curtis, 70 Mo. 594, l. c. 600.]

As was said in another case: "Deliberation is also premeditation, but it is something more. It is not only to think of beforehand, which may be but for an instant, but the inclination to do the act is considered, weighed, pondered upon, for such a length of time after provocation is given, as the jury may find was sufficient for the blood to cool. One in 'a heat of passion' may premeditate without deliberating. Deliberation is only exercised in a 'cool state of the blood' while premeditation may be either in that state of the blood, or in 'heat of passion.' " [State v. Kotovsky, 74 Mo. 247, l. c. 249.]

These decisions have frequently been cited with approval, notably in State v. Speyer, 207 Mo. 540, l. c. 552. Whether the act is or is not characterized by deliberation is a question of fact to be decided by the jury under a proper instruction from the court, provided there is any substantial evidence upon which to base it. It necessarily follows that if the facts in evidence are such that the court finds that a question exists as to whether or not

the killing was deliberately done, then that question should be submitted to the decision of the jury in an instruction upon murder in the second degree.

Under the facts stated, we think there was such a question in this case, and that such an instruction should have been given, for, be it noted that the authorities are practically agreed in this State that words may reduce the crime from murder in the first degree to murder in the second degree.

"Opprobrious epithets, insulting gestures and the like are held to constitute just provocation in this State, and, where passion or excitement of the mind is produced by such provocation to the extent that it materially interferes with the judgment and reason, an act done *at once*, under its immediate influence, cannot in law be said to be done deliberately, and the actor cannot in law be said to be in a cool state of the blood. A homicide, committed under the influence of such passion, is not murder of the first, but murder of the second, degree under our criminal code. This passion, thus produced, is a statutory concession to the frailty of human nature; but before it can operate to mitigate a homicide from murder of the first, to murder of the second, degree the party acting under its influence must act *suddenly* and before he has time to reflect." [State v. Bulling, 105 Mo. 204, l. c. 221.] See also State v. Curtis, supra; State v. Stephens, 96 Mo. 637; State v. McKenzie, 177 Mo. 699, l. c. 711.

In stating the facts which in our opinion require that an instruction on murder in the second degree should be given in this case, we have purposely stated them most strongly in favor of appellant. For our purposes, it is immaterial whether the evidence purporting to show these facts is true or false. That is a question for the jury. But appellant is entitled to have his case submitted to the jury upon instructions upon all phases of the law which may be shown by any substantial evidence to be applicable.

We are further led to this conclusion by the very right and justice of the matter. Under the instructions given, the jury was left no choice but to find the defendant guilty of murder in the first degree or to acquit him outright upon the ground of insanity. It was a hard choice. Had appellant slain his wife while he was attempting to commit rape or robbery upon another, or had he prolonged his victim's agony by the tortures of slow poisoning, like that Earl of Somerset, who, to please his mistress, murdered a prisoner in his custody in the Tower of London by mingling poison in his victim's food, or had appellant killed, as the Borgias were wont to do, by stealth and stiletto, he could not have had severer punishment meted out to him than that awarded by the jury under the instructions of the court in this instance. To say that, under the facts in this case, the law places appellant on a par with the coldest-blooded murderers in history, is to shock the sense of justice. Neither will it satisfy the conscience to say that executive mercy must be invoked to right so great a wrong. The law ought not to be, and is not, so inflexible as that it must rely upon the pardoning power to render justice where the law has failed. Like the Great Author of all law, our law "knoweth our frame and remembereth that we are dust;" it hath regard to the frailties of the flesh, and to that end and for that reason our statutes wisely and humanely differentiate between murder in the first and in the second degree, and provide a lesser punishment for the lesser crime. We do not need to wrest the law to our authority in order to meet this situation. We have only to declare the law as it is written, which is our proper function.

VI. Appellant also complains of instruction number ten, given on behalf of the State. This instruction is the familiar one relating to statements against interest made by appellant. The ground of complaint is that the instruction does not distinguish between statements made by defendant out of court, and those made by him when testifying in his

Statements
Against
Interest.

own behalf. The criticism is well founded. The instruction does not so distinguish, and was therefore erroneous. [State v. Lewis, 248 Mo. 498, l. c. 505.] Should this instruction be given upon another trial of this case, it will be an easy matter so to phrase it as to guard against this inaccuracy. However, in instances where, as in the case at bar, the statements said to have been made by the accused rest in parol only, the wisdom of giving such an instruction at all has been gravely doubted (State v. Creely, 254 Mo. 382, l. c. 397), though it has never been held to constitute reversible error. [State v. Wansong, post.]

Appellant also urges that this instruction is a comment upon the evidence and falls within the condemnation of the rule laid down in the case of State v. Finkelstein, 269 Mo. 612, where a different but somewhat similar instruction was the subject of much discussion. The exact question here presented was before the court in State v. Wansong, 195 S. W. 999, and we there held that the doctrines of the Finkelstein case should not be so extended as to embrace the instruction here in question. [See also State v. Stewart, 204 S. W. 10, l. c. 14.] We are content with our holding in the Wansong and Stewart cases, supra, and for that reason overrule this contention.

VII. Appellant complains of instruction numbered three, among other reasons, for the reason that that instruction opens with the following sentence:

"In this case insanity is interposed *by defendant's counsel* as an excuse for the charge set forth in the information." (Italics ours).

Whatever might be said about the propriety of such a statement in an instruction in a case where present insanity at the time of the trial is presented as a defense, as in State v. Duestrow, 137 Mo. 44, l. c. 69, where such an instruction was given, we think it an unnecessary and unfortunate expression in a case, such as the present, where temporary insanity at the time of the commission of the crime charged is

Insanity as Defense.

interposed as a defense. It might readily be understood by the jury in a sense highly prejudicial to the appellant. The words, "by defendant's counsel," in the sentence quoted, might well be omitted. Except in this respect, the instruction is in proper form. [State v. Duestrow, supra; State v. Holloway, 156 Mo. 222, l. c. 228; State v. Paulsgrove, 203 Mo. 193, l. c. 200.] Except as above noted, we think the instructions given fairly presented the law of the case to the jury.

VIII. We have passed upon practically all of the questions which appellant has brought to our attention. Certain others, such as the error alleged to lie in the action of the trial court in refusing the application for a new trial upon the ground of newly discovered evidence, are no longer live issues in this case, or else relate to matters which probably will not occur upon another trial of this cause.

Because of the errors which we have noted, this case should be reversed and remanded for further proceedings in harmony with the views herein expressed. It is so ordered. All concur.