**William S. GIRARD, United States Army Specialist 3/C, Petitioner,**

v.

Charles E. WILSON, Secretary of Defense, John Foster Dulles, Secretary of State, Wilbur M. Brucker, Secretary of the Army, General Maxwell D. Taylor, Head Joint Chiefs of Staff Department of Defense, Major General W. H. Maglin, Provost Marshal General United States Army, General Lyman Lemnitzer, Commanding General, Far East Command, Respondents.

**H. C. No. 47–57.**

United States District Court
District of Columbia.
June 18, 1957.

Earl J. Carroll, and Joseph S. Robinson, New York City, Dayton M. Harrington, Washington, D. C., for petitioner.

Oliver Gasch, U. S. Atty., E. Riley Casey, Asst. U. S. Atty., Harold H. Greene, Asst. U. S. Atty., Washington, D. C., for defendants.

McGARRAGHY, District Judge.

This is a Petition for a Writ of Habeas Corpus and for other relief, filed by William S. Girard, United States Army Specialist Third Class, against the Secretary of Defense and others, in which he alleges that on or about January 30, 1957, he was arrested and thereafter held in confinement by the military authorities of the United States and is presently held in such confinement for the purpose of being delivered to the Government of Japan for trial for an alleged offense over which that Government has no jurisdiction, nor does it have jurisdiction over the person of the petitioner. He further alleges that his detention is illegal and in violation of the Constitution and laws of the United States, as well as the treaty rights and obligations of the Government of the United States, and that the reasons for his detention and proposed delivery to the Japanese Government are invalid in law and in violation of fundamental constitutional and legal rights of petitioner.

The petitioner is a Specialist Third Class in the Regular Army of the United States, assigned to Company F, 8th Cavalry Regiment, at Camp Whittington, Honshu, Japan, having reenlisted while in Japan on October 28, 1954, for a period of three years.

On January 30, 1957, an incident occurred while the petitioner was on a firing range known as Camp Weir Range in Japan, resulting in the death of a Japanese woman for which the American military authorities propose to deliver petitioner to the Japanese Government for trial.

The incident is succinctly described in the certificate of the petitioner's commanding officer dated February 7, 1957, from which the following is quoted:

"'* * *, I certify that Girard, William S. RA 16 452 809, Specialist Third Class, Company F, 8th Cavalry Regiment, APO 201, was in the performance of his official duty at 1350 hours, 30 January 1957, Camp Weir Range Area, when he was involved in the following incident: On 30 January 1957, 2nd Battalion, 8th Cavalry Regiment, was engaged in routine training at Camp Weir Range Area. Company F was conducting blank firing exercises. Specialist Third Class William S. Girard was instructed by his platoon leader to move near a position near an unguarded machine gun to guard the machine gun and items of field equipment that were in the immediate area. Girard, following instructions, moved to the designated position near the machine gun. While performing his duties as guard, he fired an expended cartridge case, as a warning, which struck and killed Sakai, Naka, Kami-Shinden, Somamura, Gumma Prefecture, who had entered the range area for the purpose of gathering expended cartridge cases."

This certificate has never been withdrawn or modified in any respect.

The Security Treaty between the United States of America and Japan which entered into force on April 28, 1952, provided by Article III thereof that:

"The conditions which shall govern the disposition of armed forces of the United States of America in and about Japan shall be determined by administrative agreements between the two Governments."

Article XVII of the Administrative Agreement subsequently entered into between the Governments of the United States of America and Japan defines the offenses of which the countries have concurrent jurisdiction and exclusive jurisdiction, respectively.

Paragraph 3 of Article XVII provides that with respect to cases where the right to exercise jurisdiction is concurrent, the military authorities of the United States shall have the *primary right* to exercise jurisdiction over the members of the United States armed forces or the civilian component *in relation to offenses arising out of any act or omission done in the performance of official duty.* (Italics supplied.)

The Agreed Official Minutes regarding this provision in Paragraph 3 provide that where a member of the United States armed forces or the civilian component is charged with an offense, a certificate issued by or on behalf of his commanding officer stating that the alleged offense, if committed by him, arose out of an act or omission done in the performance of official duty, shall, in any judicial proceedings, be sufficient evidence of the fact unless the contrary is proved.

It was pursuant to these Official Minutes that the certificate of the petitioner's commanding officer was issued dated February 7, 1957.

The certificate by the commanding officer which was directed to the Chief Procurator, Maebashi District, Maebashi City, Honshu, Japan, continued by stating: "The United States will exercise jurisdiction in this case unless notification is given immediately that proof to the contrary exists."

Thereafter, on February 9, 1957, the Chief Procurator notified the petitioner's commanding officer with reference to his certificate as to official duty that "This office considers the proof contrary thereto exists, basing upon our examinations."

Following this exchange, there were discussions commencing in early March, 1957, by the representatives of the United States and representatives of Japan constituting a Joint U. S.–Japan Committee. On May 16, 1957, the United States representative on the Committee agreed that the United States would not exercise its asserted right of primary jurisdiction in this case. This action is said to have been taken in

accordance with Paragraph 3(c) of Article XVII of the Administrative Agreement, which reads as follows:

"If the State having the primary right decides not to exercise jurisdiction, it shall notify the authorities of the other State as soon as practicable. The authorities of the State having the primary right shall give sympathetic consideration to a request from the authorities of the other State for a waiver of its right in cases where that other State considers such waiver to be of particular importance."

Thereafter, on June 4, 1957, the Secretary of State of the United States and the Secretary of Defense of the United States who are named as two of the defendants in this action, issued a joint statement that they had carefully reviewed all of the available facts in this case, and have now concluded that the agreement that the petitioner be tried in the courts of Japan was reached in full accord with procedures established by the Treaty and Agreement, and that in order to preserve the integrity of the pledges of the United States, this determination by the Joint Committee must be carried out.

This joint statement related the circumstances substantially the same as, but in more detail than, those contained in the certificate by the petitioner's commanding officer. The following is quoted from the joint statement:

"* * * The incident occurred in a maneuver area provided by the Japanese Government for part-time use of United States forces. The Japanese Defense Force uses the same area about 40% of the time. When the area is not in use by either the United States or Japanese armed forces, Japanese civilians are permitted to farm or otherwise use the area.

"Efforts to keep civilians away from the area during such military exercises have not proved effective. In this particular case, red boundary flags were, as customary, erect-

ed as a warning to civilians to keep off, and local authorities were notified of the proposed exercises. But, as was frequently the case, a number of Japanese civilians were in the area gathering empty brass cartridge cases at the time of the incident. These civilians had created such a risk of injury to themselves in the morning exercises when live ammunition was used that the American officer in charge withdrew live ammunition from the troops prior to the afternoon exercises. In the interval between two simulated attacks during the afternoon, Girard and another soldier, Specialist 3rd Class Victor M. Nickel, were ordered by their platoon leader, a lieutenant, to guard a machine gun and several field jackets at the top of a hill. Girard and Nickel were not issued live ammunition for this duty.

"It was while these soldiers were performing this duty that the incident occurred. Mrs. Naka Sakai, a Japanese civilian, died a few moments after being hit in the back by an empty brass rifle shell case fired by Girard from his rifle grenade launcher. She was not over 30 yards from Girard and was going away from him when he fired the rifle. Girard had previously fired similarly in the vicinity of a Japanese man, who was not hit.

"Girard's action in firing empty shell cases from the rifle grenade launcher was not authorized. He asserted that he fired from the waist, intending only to frighten the Japanese civilians. Others stated, but Girard denied, that empty shell cases were thrown out to entice the Japanese to approach. * * *"

The joint statement relates that "The Commanding General of Girard's Division certified that Girard's action was done in performance of official duty".

The joint statement further relates that during the course of the meetings between the United States and Japanese representatives, while consideration was given to referring the matter in dispute to the two Governments for settlement, this procedure was rejected as inadvisable under the circumstances, and instructions were issued that the United States representative on the Joint Committee should continue to press the claim for jurisdiction, but that, in case of continued deadlock, the United States representative was authorized to waive jurisdiction to Japan. After three weeks of additional negotiations "The U. S. representative waived jurisdiction in the name of the United States."

Thereafter, Girard was indicted by the Japanese judicial authorities for causing a death by wounding and at the present time he is administratively restricted to the limits of Camp Whittington.

The joint statement of the Secretaries was released on June 4, 1957 and the petition for Writ of Habeas Corpus was filed in this Court on June 6, 1957; an Order to Show Cause was issued the same day returnable on June 11, 1957, to which the respondents made return with accompanying exhibits, and the cause submitted for decision after full argument.

The decision of this case does not determine the guilt or innocence of the petitioner. The issue here is what tribunal should determine that question, and does the petitioner have a constitutional right which would be violated if he should be delivered to the Japanese Government for trial.

Nor is the question whether or not the petitioner would receive a fair trial if delivered to the Japanese Government for trial.

An affidavit of the General Counsel, Department of Defense, details the experience of the three United States Armed Services in Japan since the effective date of the Administrative Agreement in Japan and states that in a few instances suggestions of possible infringement of the rights of the accused have been made by an observer; that sub-

sequent investigation by the Field Commander of the accused's has, in each instance, refuted or dispelled the suggestion and to date there has been no instance of the exercise by Japan of criminal jurisdiction over United States personnel in which the conduct of the proceedings has disclosed a basis for diplomatic intervention.

On the basis of this experience, it is assumed that the petitioner would receive a fair trial if the defendants should deliver the petitioner to the Japanese Government for trial under the Japanese Constitution and laws.

The question which this Court must decide is whether the petitioner has a right under the Constitution of the United States to be tried for the alleged offense in an appropriate American tribunal and would that constitutional right be violated if he is delivered to the Japanese Government for trial.

It is uncontroverted that the petitioner at the time of the alleged occurrence was acting as a member of the American armed forces in the performance of his official duties as guard.

The certificate of the petitioner's commanding officer relates that petitioner "was instructed by his platoon leader to move near a position near an unguarded machine gun to guard the machine gun and items of field equipment that were in the immediate area"; that petitioner *"following instructions,* moved to the designated position near the machine gun" and *"while performing his duties as guard"* he fired the expended cartridge case. (Italics supplied.)

The joint statement issued by the Secretary of State and the Secretary of Defense, after relating the guard duty assigned to the petitioner and another soldier, states *"It was while these soldiers were performing this duty that the incident occurred."* The joint statement further says that "the Commanding General of Girard's division certified that Girard's action was done in performance of official duty". (Italics supplied.)

At the hearing on the Petition and the defendants' return to the Order to Show Cause, and on defendants' Motion to Quash Subpoenas issued by the petitioner, the United States Attorney stated it could be assumed "that the offense arose out of an incident, an act or omission in the performance of an official duty". Subsequently, the following colloquy ensued:

"The Court: Mr. Gasch, you say let's assume certain facts. Is the government conceding those facts. I am assuming that your argument is addressed primarily at this stage to the motions to quash.

"Mr. Gasch—(United States Attorney): Yes, Your Honor.

"The Court: The Court, in passing on the motions to quash, has to know what the issues of fact are. Now, when you say let's assume he was acting in an official capacity or, in the language of the agreement, 'offenses arising out of any act or omission done in the performance of official duty', is the government conceding that at the time he came within the purview of this language?

"Mr. Gasch: Your Honor, I don't think this is a question in which I dispute or a case in which I dispute that interpretation of the facts.

"The Court: What I am trying to make clear is this: It seems to me that in passing on the motions to quash, I have got to know what are the issues of fact in this case and what is agreed to and what isn't agreed to.

"Mr. Gasch: Very well, Your Honor, let's say as far as the government is concerned, those are the facts.

"Mr. Carroll—(Counsel for Petitioner): What are the facts, Your Honor? I don't understand.

"The Court: The Court understands the concession by the government to be that at the time of the alleged offense by the petitioner, it

arose out of an act or omission done in the performance of official duty. Is that correct?

"Mr. Gasch: *That is correct.*" (Italics supplied.)

If there had been any disagreement as to this material and basic fact, the Court would have been required to issue the Writ in order that a full hearing could be held to determine the fact. In resisting the argument of petitioner's counsel that the Writ should issue, counsel for the defendants insisted that there is no material issue of fact.

Accordingly, the determination of the legal question here to be decided will be based upon the conceded fact that the incident for which it is proposed to deliver the petitioner to the Japanese courts for trial arose out of an act or omission done by the petitioner as a member of the American armed forces in the performance of official duty.

Section 8 of Article I of the Constitution of the United States provides that the Congress shall have power "to make Rules for the Government and Regulation of the land and naval Forces".

Acting under this authority, the Congress has adopted a Uniform Code of Military Justice, 50 U.S.C.A. § 551 et seq., which makes subject to its provisions "all persons belonging to a regular component of the armed forces". § 552.

■ This Code, as its name implies, is a comprehensive Criminal Code applying to the persons subject to its provisions and spells out in detail the procedures for the Courts-Martial jurisdiction, appointment and composition of Courts-Martial, pre-trial and trial procedure, sentences, review of Courts-Martial, and definition of offenses punishable under the Code. In other words, if the petitioner is subject to prosecution for an act or omission done by him as a member of the American Armed Forces in the performance of official duty, the Uniform Code of Military Justice establishes every procedure to be followed.

■ Since the petitioner's act was committed in the performance of official duty, under the principles announced by the Supreme Court in the case of In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55, the petitioner is accountable only to United States Federal jurisdiction for any act or omission. Additional authorities in support of this proposition are Johnson v. State of Maryland, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126; Brown v. Cain, D.C., 56 F.Supp. 56; Lima v. Lawler, D.C., 63 F.Supp. 446; People of State of Colorado v. Maxwell, D.C., 125 F.Supp. 18; In re Fair, C.C., 100 F. 149; In re Wulzen, D.C., 235 F. 362.

In some of these cases, the factual situation was in dispute and required lengthy hearings to determine if the petitioner was acting in performance of official duty. Not so in the instant case, since the status of the petitioner is conceded.

The defendants place reliance upon the decisions of this Court in the cases of May v. Wilson, D.C.D.C., 153 F.Supp. 688, and Cozart v. Wilson, 98 U.S.App. D.C. 437, 236 F.2d 732. Both of these cases arose out of offenses committed when the petitioners were off duty and, therefore, factually are distinguishable from the case now under consideration. May was not appealed, and in Cozart the Supreme Court granted a Petition for Writ of Certiorari and vacated the judgment of the Court of Appeals, remanding the case to the District Court with directions to dismiss the petition for Writ of Habeas Corpus upon the ground that the cause is moot. 352 U.S. 884, 77 S.Ct. 126, 1 L.Ed.2d 82. In pursuing this procedure, the Supreme Court cited United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 107, 95 L.Ed. 36, which states "that procedure clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance."

Counsel for the defendants also cite cases in support of the proposition that "the jurisdiction of a Court-Martial is

not exclusive and does not preempt the jurisdiction of state courts to deal with acts which violate state law·as well as military law."

In none of the cases cited in support of this proposition were the accused charged with an offense performed in line of duty.

In Caldwell v. Parker, 252 U.S. 376, 40 S.Ct. 388, 64 L.Ed. 621, the petitioner was charged with murder of a civilian at a place within the jurisdiction of the State of Alabama and not within the confines of any camp or place subject to the control of the civil or military authorities of the United States. Kennedy v. Sanford, 5 Cir., 166 F.2d 568, related to a charge of conspiracy; United States v. Matthews, D.C., 49 F.Supp. 203, was a charge of rape; and United States v. Canella, D.C., 63 F.Supp. 377, related to a charge of bribery. Clearly these cases are distinguishable from the facts in the instant case.

Counsel for defendants further cite a series of cases in support of the proposition that "if there is any question as to whether a particular act was strictly within the scope of the authority of the soldier or whether such act constituted the only means available to perform the assigned duty, then the state court rather than a court-martial must be allowed to proceed with the case." These decisions are not in point in view of the stipulation that there is no issue of material fact with respect to the status of the petitioner at the time of the incident.

Applying the same constitutional protection to the petitioner against his delivery to a foreign State that would be applied to his delivery for prosecution in a state court, it follows that the threatened action by the defendants is illegal and in violation of the Constitution and laws of the United States.

■■ The petition is for a Writ of Habeas Corpus which appears to be authorized by Cozart v. Wilson, supra, and ·Eisentrager v. Forrestal, 84 U.S.App.D. C. 396, 174 F.2d 961, since the petitioner is administratively restricted to the limits of Camp Whittington and, therefore, he is sufficiently restrained for the purposes of habeas corpus. However, since the petitioner remains a member of the United States Armed Forces in Japan and may be prosecuted in Court-Martial proceedings for the offense with which he is charged, the petition for the Writ will be denied and the Court will treat the complaint as a Petition for Declaratory Judgment and Injunction under the prayer of the complaint for other relief and, as such, will decree that the proposed delivery of the petitioner to the Japanese Government would violate rights of the petitioner guaranteed by the Constitution of the United States and will be enjoined.

This opinion may be treated as the Court's Findings of Fact and Conclusions of Law, and counsel for petitioner will submit an appropriate order in conformity herewith.